Gene Y. Kang, Esq.
Michael Vanunu, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
25 Main Street, Suite 501
Court Plaza North
Hackensack, New Jersey 07601
(201) 287–2460

*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO.,<br><br>　　　　　　　　　　Plaintiffs,<br><br>–against–<br><br>OASIS MEDICAL AND SURGICAL WELLNESS GROUP, LLC, RALPH DANIEL, P.A., KEITH JOHNSON, M.D., SUJAL PATEL, M.D., SAMUEL SCHENKER, M.D., SAMMY MASRI, M.D., and RALPH WHEELER, M.D.,<br><br>　　　　　　　　　　Defendants. | Case No.:<br><br><br>**COMPLAINT**<br><br>Plaintiffs Demand a Trial by Jury |

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

1

## **INTRODUCTION**

1.      This action seeks to recover more than $3,400,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges through Oasis Medical And Surgical Wellness Group, LLC ("Oasis") for purported initial examinations, electrodiagnostic testing, and interventional pain management services (the purported initial examinations, electrodiagnostic testing, and interventional pain management services are referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided, to the extent that they were provided at all, to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that Oasis was, at all relevant times, not in compliance with all significant laws and regulations governing healthcare practice in New Jersey, because:

(i)      Oasis and its owners provided and received unlawful compensation in exchange for patient referrals;

(ii)     the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, because they were provided – to the extent that they were provided at all – pursuant to the Defendants' illegal referral scheme; and

(iii)    the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre–determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

4.      The Defendants fall into the following categories:

(i)      Defendant Oasis is a New Jersey medical professional limited liability company through which the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(ii)     Defendants Keith Johnson, M.D. ("Johnson"), Sujal Patel, M.D. ("Patel"), and Ralph Wheeler, M.D. ("Wheeler") are physicians who purported to perform many of the Fraudulent Services on behalf of Oasis and, upon information and belief as set forth herein, were members of and co-owned Oasis.

(iii)    Defendants Schenker, M.D. ("Schenker"), Sammy Masri, M.D. ("Masri"), and Ralph Daniel, P.A. ("Daniel") are physicians and a physician assistant, respectively, and purported to perform many of the Fraudulent Services on behalf of Oasis.

5.       As set forth below, the Defendants at all relevant times have known that:

(i)      the Defendants were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no-fault insurance reimbursement in the first instances;

(ii)     the Fraudulent Services were not provided in compliance with all significant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no-fault insurance reimbursement in the first instance;

(iii)    the Fraudulent Services were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre–determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)     in many cases, the Fraudulent Services were never provided in the first instance; and

(v)      the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.       As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Oasis.

7.       The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that the Defendants submitted, or caused to be submitted, to GEICO.

8.      The Defendants' fraudulent scheme began as early as 2015 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages of more than $3,400,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

### II.      Defendants

10.     Defendant Oasis is a New Jersey medical professional limited liability company with its principal place of business in New Jersey. Oasis was formed on or about August 26, 2013 as "Medical and Surgical Associates of Glen Rock, LLC". Upon information and belief as set forth herein, Oasis was co-owned by Johnson, Patel, Wheeler, and non-party Bryan Massoud, M.D. ("Massoud"), and had Johnson, Wheeler, Patel, and Massoud as its members. Oasis was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

11.     Defendant Johnson resides in and is a citizen of New York. Johnson was licensed to practice medicine in New Jersey in 2004, purported to perform many of the Fraudulent Services on behalf of Oasis, and, upon information and belief as set forth herein, was a co-owner and member of Oasis, and controlled Oasis.

12.     Defendant Patel resides in and is a citizen of New Jersey. Patel was licensed to practice medicine in New Jersey in 2015, purported to perform many of the Fraudulent Services

on behalf of Oasis, and, upon information and belief as set forth herein, was a co-owner and member of Oasis, and controlled Oasis.

13.     Defendant Wheeler resides in and is a citizen of New Jersey. Wheeler was licensed to practice medicine in New Jersey in 1995, purported to perform many of the Fraudulent Services on behalf of Oasis, and, upon information and belief as set forth herein, was a co-owner and member of Oasis, and controlled Oasis.

14.     Defendant Schenker resides in and is a citizen of New Jersey. Schenker was licensed to practice medicine in New Jersey in 1982, and purported to perform many of the Fraudulent Services on behalf of Oasis.

15.     Defendant Masri resides in and is a citizen of New Jersey. Schenker was licensed to practice medicine in New Jersey in 2003, and purported to perform many of the Fraudulent Services on behalf of Oasis.

16.     Defendant Daniel resides in and is a citizen of New Jersey. Daniel was licensed to practice as physician assistant in New Jersey in 2012, and purported to perform many of the Fraudulent Services on behalf of Oasis.

## III.   <u>Massoud</u>

17.     Although he has not been named as a Defendant in this action, Massoud is relevant to understanding the claims in this action. Massoud was a New Jersey-licensed physician, who organized Oasis and was one of Oasis's initial members.

18.     As set forth above, upon information and belief, Johnson, Patel, and Wheeler were also co-owners and members of Oasis, together with Massoud.

19.     In particular, Massoud died in January 2020.

20.     Though New Jersey law requires that medical professional limited liability companies such as Oasis be owned solely by licensed healthcare professionals, Oasis did not cease its operations upon Massoud's death.

21.     Instead, GEICO continued to receive large amounts of no-fault insurance billing for healthcare services purportedly rendered at Oasis by Johnson, Patel, and Wheeler following Massoud's death.

22.     Moreover, Johnson, Patel, and Wheeler have been prominently featured on Oasis' website following Massoud's death and – based upon their respective professional credentials – have been the most senior personnel at Oasis in the months since Massoud's death.

## IV.     The Referral Sources

23.     Although they have not been named as Defendants in this Complaint, Konstantine Fotiou, D.C. ("Fotiou"), First Care Chiropractic, LLC ("First Care"), Frank Belverio, D.C. ("Belverio"), Premier Healthcare Center, LLC ("Premier"), Victor T. Verlezza, D.C. ("Verlezza"), Essex Valley Spine and Health Care Center, LLC ("Essex Valley"), Spine and Rehabilitation Center of the Oranges, LLC ("SRC Oranges"), Spine and Rehabilitation Center of the Plainfields, LLC ("SRC Plainfields"), Vincent Saraceno, D.C. ("Saraceno"), Newark Pain and Rehab Center, LLC ("Newark Pain"), Stephen Levine, D.C. ("Levine"), and South Orange Chiropractic Center, LLC ("South Orange") (collectively, the "Referral Sources") are relevant to understanding the claims in this action.

24.     Fotiou, and First Care are, respectively, a chiropractor licensed to practice chiropractic in New Jersey, and a New Jersey chiropractic professional limited liability company that is owned by Fotiou.

25.     Fotiou and First Care received unlawful compensation from Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler in exchange for patient referrals to Oasis.

26.     Belverio, and Premier are, respectively, a chiropractor licensed to practiced chiropractic in New Jersey, and a New Jersey chiropractic limited liability company that is owned by Belverio.

27.     Belverio and Premier received unlawful compensation from Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler in exchange for patient referrals to Oasis.

28.     Verlezza, Essex Valley, SRC Oranges, and SRC Plainfields are, respectively, a chiropractor licensed to practiced chiropractic in New Jersey, a New Jersey chiropractic professional corporation, aand two New Jersey chiropractic limited liability companies that are owned by Verlezza.

29.     Verlezza, Essex Valley, SRC Oranges, and SRC Plainfields received unlawful compensation from Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler in exchange for patient referrals to Oasis.

30.     Saraceno and Newark Pain are, respectively, a chiropractor licensed to practiced chiropractic in New Jersey, and a New Jersey chiropractic professional corporation that is owned by Saraceno.

31.     Saraceno and Newark Pain received unlawful compensation from Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler in exchange for patient referrals to Oasis.

32.     Levine and South Orange are, respectively, a chiropractor licensed to practiced chiropractic in New Jersey, and a New Jersey chiropractic professional corporation that is owned by Levine.

33.     Levine and South Orange received unlawful compensation from Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler in exchange for patient referrals to Oasis.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

35.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

36.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

37.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.      The New Jersey No-Fault Laws**

38.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries. The statutory system is embodied

within the Compulsory Insurance Law (N.J.S.A. 39:6B–1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A–1 et seq.)(collectively referred to as the "no-fault laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

39.     Under the no-fault laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA–1500" form or "CMS-1500" form).

**B.     No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice**

40.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all significant laws and regulations governing healthcare practice in New Jersey.

41.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary. See, e.g., Liberty Mut. Ins. Co. v. Healthcare Integrated Servs., 2009 N.J. Super. Unpub. LEXIS 2416 at *4 – *5 (App. Div. 2009) ("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co., 366 N.J. Super. 1, 6 (App. Div. 2004) (healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 515–519 (App. Div. 1997) (healthcare services

provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); Allstate Ins. Co. v. Greenberg, 376 N.J. Super. 623, 632 (Law Div. 2004) ("A medical services provider's failure to comply with the standards promulgated by the State Board Examiners make it ineligible to receive PIP reimbursement."); Allstate Ins. Co. v. Schick, 328 N.J. Super. 611, 620 (1999) ("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

42.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice in New Jersey. See, e.g., Healthcare Integrated Servs., supra; Orthopedic Evaluations, Inc., supra.

43.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

44.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.     New Jersey Law Regarding the Payment or Receipt of Compensation in Exchange for Patient Referrals**

45.     Pursuant to N.J.A.C. 13:35–6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

46.     Among other things, N.J.A.C. 13:35–6.17(c)(1) specifies that:

> A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a healthcare service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the healthcare service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or consulting or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name … .

(Emphasis added).

47.     N.J.A.C. 13:35–6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

48.     In keeping with the broad anti–kickback prohibitions in N.J.A.C. 13:35–6.17(c)(1), N.J.A.C. 13:35–6.17(h) provides, in pertinent part, that:

> A Board licensee may lease space or medical equipment to or from another licensed healthcare professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space or equipment.

(Emphasis added).

49.     Similarly, pursuant to N.J.A.C. 13:44E–2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

50.     In keeping with the general proscription against the payment of compensation in exchange for patient referrals (see N.J.A.C. 13:35–6.17; N.J.A.C. 13:44E–2.6), and the specific provisions of N.J.A.C. 13:35–6.17 that are aimed at preventing illegal referral fees from being disguised as ostensibly–legitimate "rent" payments (see N.J.A.C. 13:35–6.17(h)), N.J.A.C. 13:44E–3.9 provides – in pertinent part – that:

> A chiropractic physician requesting that another chiropractic physician or other practitioner

perform any diagnostic tests shall … [n]ot refer a patient to another practitioner practicing at the same premises …, unless: … [t]hat other practitioner is a bona fide partner, fellow shareholder of a professional service corporation or other permitted practice structure, or a regularly salaried practitioner–employee of the chiropractic physician requesting the performance of a diagnostic test … .

51.     N.J.A.C. 13:44E–3.1 defines "practitioner" as "a licensee of a professional board authorized to render health care services, including, but not limited to, chiropractic physicians, medical doctors, podiatric physicians, physical therapists and registered professional nurses."

52.     N.J.A.C. 13:44E–3.1 defines "diagnostic test" to include electrodiagnostic tests such as electromyography tests ("EMGs") and nerve conduction velocity tests ("NCVs").

53.     Thus, pursuant to N.J.A.C. 13:44E–3.9, a chiropractor may not refer a patient for EMG and NCV tests to a physician practicing at the same premises as the chiropractor, unless the physician actually is the chiropractor's <u>bona</u> <u>fide</u> partner, fellow shareholder in a professional entity, or regularly salaried employee.

54.     Therefore, physicians, chiropractors, medical practices, and chiropractic practices that pay or receive kickbacks or unlawful compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

**D.     New Jersey Law Regarding Accurate Designation of Practice Locations in Billing and Treatment Reports**

55.     Moreover – and again, in keeping with the general proscription against the payment of compensation in exchange for patient referrals (see N.J.A.C. 13:35-6.17; N.J.A.C. 13:44E-2.6), and the specific provisions of N.J.A.C. 13:35-6.17 that are aimed at preventing illegal referral fees from being disguised as ostensibly-legitimate "rent" payments (see N.J.A.C. 13:35-6.17(h)) – N.J.A.C. 13:35-6.1(h) requires physicians and medical practices to set forth, in their billing and treatment reports, the actual locations where the underlying healthcare services were performed.

56.     The New Jersey State Board of Medical Examiners implemented this regulation out

of concern – among other things – that:

> potential patients or other persons cannot readily ascertain whether there is a fixed and stable professional office, as contrasted with a mobile facility or itinerant practitioner offering services of a suspect ethical nature. Investigations of suspected malpractice, unlicensed practice, or insurance fraud are hampered by inadequate information to show the location of the office (if any) from which the professional services are offered. Increasingly, the Board is receiving complaints about apparent itinerant licensees who are invited to examine "referred" patients on the premises of other health care practitioners, with a resulting claim form which lists a post office box payment address and masks the fact of identical, albeit temporary, location of the two practitioners.

See 30 N.J.R. 4317(a).

57.     Physicians and medical practices that fail to set forth – in their billing and treatment reports – the actual locations where the underlying healthcare services were performed are not eligible to receive PIP Benefits.

**E.     New Jersey Law Prohibiting Self-Referrals**

58.     In New Jersey, with limited exceptions that are not applicable here, "practitioners" generally may not refer patients to a healthcare practice in which they have a "significant beneficial interest".

59.     Specifically, N.J.S.A. 45:9–22.5 (the "Codey Law") provides – in pertinent part – that:

> A practitioner shall not refer a patient or direct an employee of the practitioner to refer a patient to a health care service in which the practitioner, or the practitioner's immediate family, or the practitioner in combination with the practitioner's immediate family has a significant beneficial interest … .

60.     Pursuant to N.J.S.A. 45:9–22.4:

> "Practitioner" means a physician, chiropractor or podiatrist licensed pursuant to Title 45 of the Revised Statutes.

> "Health care service" means a business entity which provides on an inpatient or outpatient basis: testing for or diagnosis or treatment of human disease or dysfunction; or dispensing of drugs or medical devices for the treatment of human disease or dysfunction. Health care service includes, but is not limited to, a bioanalytical laboratory, pharmacy, home health

care agency, rehabilitation facility, nursing home, hospital, or a facility which provides radiological or other diagnostic imagery services, physical therapy, ambulatory surgery, or ophthalmic services.

"Significant beneficial interest" means any financial interest; but does not include ownership of a building wherein the space is leased to a person at the prevailing rate under a straight lease agreement, or any interest held in publicly traded securities.

61.     Pursuant to N.J.S.A. 45:9–22–5(c)(1), the Codey Law's restrictions on patient referrals do not apply to:

medical treatment or a procedure that is provided at the practitioner's medical office and for which a bill is issued directly in the name of the practitioner or the practitioner's medical office … .

62.     Physicians and medical practices in New Jersey that engage in self-referral arrangements that violate the Codey Law are not eligible to receive PIP Benefits.

**F.     No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

63.     Pursuant to N.J.S.A. 39:6A–4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

64.     Pursuant to N.J.S.A. 39:6A–2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)     is not primarily for the convenience of the injured person or provider;

(ii)    is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)   does not involve unnecessary diagnostic testing.

65.     Pursuant to the no-fault laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3–4.6.

66.     Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)     cervical spine strains, sprains, and contusions;

(ii)    cervical herniated disks or radiculopathies;

(iii)   thoracic spine strains, sprains, and contusions;

(iv)    thoracic herniated disks or radiculopathies;

(v)     lumbar–sacral spine strains, sprains, and contusions; and

(vi)    lumbar–sacral herniated disks or radiculopathies.

67.     The Care Paths generally provide for an initial, four–week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

68.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

69.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

## G.  The Fee Schedule and Current Procedural Terminology Codes

70.     New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

71.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

72.     The no-fault laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

73.     The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

74.     Additionally, no-fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

75.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3–29.4.

76.     With respect to unbundling, N.J.A.C. 11:3–29.4 provides that:

Artificially separating or partitioning what is inherently one total Procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

77.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

78.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the Procedure represents a 'separate Procedure.' The inclusion of this statement indicates that the Procedure, while possible to perform separately, is generally included in a more comprehensive Procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

## H.     The New Jersey Insurance Fraud Prevention Act

79.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A–1 et seq. A healthcare services provider violates the Insurance Fraud Prevention Act if, among other things, it:

Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Conceals or knowingly fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A–4.

80.     A healthcare services provider also violates the Insurance Fraud Prevention Act if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

81.     Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A–7(a).

82.     A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A–7(b).

83.     The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A–3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A–3.

## I.     New York Law Regarding the Operation of New Jersey Medical Practices in New York

84.     Pursuant to the New York Education Law, foreign medical professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. See, e.g., N.Y. Educ. Law §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

85.     Foreign medical professional entities that operate in New York without obtaining the requisite certificate of authority and authorization are not eligible to receive PIP Benefits.

## II.     The Defendants' Fraudulent Scheme

86.     Beginning no later than 2015, and continuing through the present date, the Defendants masterminded and implemented a massive fraudulent scheme in which they billed GEICO millions of dollars, or caused GEICO to be billed millions of dollars, for unlawful, medically unnecessary, and otherwise non-reimbursable services.

A.     **The Payment and Receipt of Unlawful Compensation in Exchange for Patient Referrals**

87.     Oasis did not provide healthcare services at any single, fixed location.

88.     Instead, Oasis operated on an itinerant basis from the offices of the Referral Sources, including offices at the following locations:

(i)     the offices of First Care and Fotiou, located at: (a) 274 High Street, Perth Amboy, New Jersey; (b) 667 Chambers Street, Trenton, New Jersey; (c) 669 Chambers Street, Trenton, New Jersey; and (d) 94 South Munn Avenue, East Orange, New Jersey;

(ii)     the offices of Premier and Belverio, located at 39 S Fullerton Avenue, Montclair, New Jersey;

(iii)     the offices of Verlezza and Essex Valley, located at 576 Central Ave, Suite 302, East Orange, New Jersey; Verlezza and SRC Plainfields, located at 205 East 5th Street, Plainfield, New Jersey; and Verlezza and SRC Oranges, located at 200 Freeway Drive East, East Orange, New Jersey;

(iv)     the offices of Newark Pain and Saraceno, located at 128 Ferry Street, Newark, New Jersey; and

(v)     the offices of Levine and South Orange, located at 60 First Street, South Orange, New Jersey.

89.     In order to bill GEICO and other automobile insurers for the Fraudulent Services, Oasis needed to obtain patient referrals from other healthcare providers.

90.     At the same time, the Referral Sources wanted to submit as much billing for chiropractic services as possible to GEICO and other insurers, without regard for whether the underlying chiropractic services were medically necessary.

91.     However, to the extent that the Insureds in the claims set forth in Exhibit "1" suffered any injuries at all in their automobile accidents, they generally were minor soft tissue injuries such as sprains or strains.

92.     Ordinary soft tissue injuries such as sprains or strains generally resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths require healthcare services providers to demonstrate why continued treatment is necessary beyond the four–week, eight–week, and 13–week marks.

93.     As a result, the Referral Sources knew that their ability to submit and obtain payment on large amounts of chiropractic billing to GEICO and other automobile insurers would be limited by the Care Paths, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic services beyond the first four or eight weeks of treatment, much less the 13–week mark.

94.     The Referral Sources also knew that – pursuant to the Care Paths – it would be much easier for them to obtain payment on large amounts of no-fault insurance billing for medically unnecessary chiropractic services if a licensed physician or physicians were to: (i) generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains; and/or (ii) recommend the continued provision of chiropractic services beyond the first four, eight, or 13 weeks of treatment.

95.     Accordingly, the Referral Sources entered into secret agreements with Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler, whereby the Referral Sources referred Insureds to Oasis for expensive and medically unnecessary examinations and electrodiagnostic testing, despite the Insureds' total lack of any genuine presenting problems that warranted the examinations or electrodiagnostic testing.

96.     In exchange for the medically unnecessary referrals, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler paid unlawful compensation to the Referral Sources.

97.     The unlawful compensation was provided in the form of : (i) ostensibly legitimate payments to "lease" space at the offices of the Referral Sources, which actually were disguised kickbacks paid in exchange for patient referrals; and (ii) unwarranted return referrals back from Oasis to the Referral Sources for the continued provision of medically unnecessary chiropractic services.

98.     In reality, these were "pay–to–play" arrangements that caused the Referral Sources to provide access to Insureds and to refer Insureds to Oasis for the medically unnecessary examinations and electrodiagnostic testing.

99.     In keeping with the fact that the payments that Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler made to the Referral Sources constituted illegal referral fees, rather than legitimate lease payments, the putative "rent" was not a fixed fee set in advance, and did not cover any regular lease terms. See N.J.A.C. 13:35–6.17(h).

100.    Rather, the amount of the purported "lease" payments was based on the volume of Insureds that the Referral Sources referred to Oasis.

101.    In keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, the Defendants did not operate from the Referral Sources' offices on a regular, consistent basis. Instead, they would only appear at the Referral Sources' offices on behalf of Oasis on dates when the Referral Sources had patients to refer to Oasis for the Fraudulent Services.

102.    In keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, the Referral Sources' offices did not contain any signage or other indicia of Oasis' ongoing presence at the offices.

103.    In addition to the phony "lease" payments, the Defendants' false contentions that Insureds continued to suffer from high levels of pain as the result of their relatively minor automobile accidents, false diagnoses of Insureds with radiculopathies and neuropathies, and the subsequent return referrals by the Defendants to the Referral Sources for continued medically unnecessary chiropractic services, constituted unlawful compensation to the Referral Sources for their initial referrals of Insureds to Oasis.

104.    In keeping with the fact that the Referral Sources' referrals to Oasis were medically unnecessary, in the claims identified in Exhibit "1", the Referral Sources did not rely upon the purported results of the electrodiagnostic testing that the Defendants supposedly provided.

105.    In keeping with the fact that the Defendants' return referrals to the Referral Sources were not predicated on medical necessity, and in fact constituted unlawful compensation to the Referral Sources for their initial referrals of Insureds to Oasis, the Defendants' own records indicated that the Referral Sources' prior chiropractic treatment had not been effective in resolving the Insureds' supposed complaints.

106.    For example:

(i)    On July 5, 2015, an Insured named LO was involved in an automobile accident. Thereafter, LO sought treatment from Verlezza and Essex Valley, who provided LO with chiropractic treatment between July 2015 and July 2016. In July 2016, Verlezza and Essex Valley caused LO to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Verlezza and Essex Valley. Thereafter, on July 21, 2016, Massoud purported to examine LO on behalf of Oasis. In his July 21, 2016 examination report, Massoud falsely contended that LO continued to suffer from pain in her back and neck as the result of her accident, despite the fact that – by that point – LO had received 12 months of chiropractic services from Verlezza and Essex Valley. Though the chiropractic treatment that Verlezza and Essex Valley purportedly had provided supposedly had been ineffective in resolving LO's putative symptoms, Massoud nonetheless referred LO back to Verlezza and Essex Valley for continued treatment at the conclusion of July 21, 2016 examination. This medically unnecessary return referral to Verlezza and Essex Valley was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(ii)     On December 12, 2015, an Insured named ML was involved in an automobile accident. Thereafter, ML sought treatment from Fotiou and First Care, who provided ML with chiropractic treatment between December 2015 and March 2016. In March 2016, Fotiou and First Care caused ML to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Fotiou and First Care. Thereafter, on March 21, 2016, Daniel purported to examine ML on behalf of Oasis. In his March 21, 2016 examination report, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – falsely contended that ML continued to suffer from pain in her neck and back as the result of her accident, despite the fact that – by that point – ML had received four months of chiropractic services from Fotiou and First Care. Though the chiropractic treatment that Fotiou and First Care purportedly had provided supposedly had been ineffective in resolving ML's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred ML back to Fotiou and First Care for continued treatment at the conclusion of March 21, 2016 examination. This medically unnecessary return referral to Fotiou and First Care was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(iii)    On April 2, 2016, an Insured named CN was involved in an automobile accident. Thereafter, CN sought treatment from Fotiou and First Care, who provided CN with chiropractic treatment between April 2016 and September 2016. In September 2016, Fotiou and First Care caused CN to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Fotiou and First Care. Thereafter, on September 28, 2016, Daniel purported to examine CN on behalf of Oasis. In his September 28, 2016 examination report, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – falsely contended that CN continued to suffer from pain in her shoulder, neck and back as the result of her accident, despite the fact that – by that point – CN had received five months of chiropractic services from Fotiou and First Care. Though the chiropractic treatment that Fotiou and First Care purportedly had provided supposedly had been ineffective in resolving CN's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred CN back to Fotiou and First Care for continued treatment at the conclusion of September 28, 2016 examination. This medically unnecessary return referral to Fotiou and First Care was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(iv)     On April 8, 2016, an Insured named JA was involved in an automobile accident. Thereafter, JA sought treatment from Belverio and Premier, who provided JA with chiropractic treatment between May 2016 and September 2016. In September 2016, Belverio and Premier caused JA to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson,

Patel, and Wheeler paid to Belverio and Premier. Thereafter, on September 19, 2016, Massoud purported to examine JA on behalf of Oasis. In his September 19, 2016 examination report, Massoud falsely contended that JA continued to suffer from pain in his neck, back and shoulder as the result of his accident, despite the fact that – by that point – JA had received four months of chiropractic services from Belverio and Premier. Though the chiropractic treatment that Belverio and Premier purportedly had provided supposedly had been ineffective in resolving JA's putative symptoms, Massoud nonetheless referred JA back to Belverio and Premier for continued chiropractic treatment at the conclusion of the September 19, 2016 examination. This medically unnecessary return referral to Belverio and Premier was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(v)  On May 20, 2016, an Insured named WC was involved in an automobile accident. Thereafter, WC sought treatment from Verlezza and SRC Plainfields, who provided WC with chiropractic treatment between May 2016 and August 2016. In August 2016, Verlezza and SRC Plainfields caused WC to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Verlezza and SRC Plainfields. Thereafter, on August 18, 2016, Massoud purported to examine WC on behalf of Oasis. In his August 18, 2016 examination report, Massoud falsely contended that WC continued to suffer from pain in his knee as the result of his accident, despite the fact that – by that point – WC had received three months of chiropractic services from Verlezza and SRC Plainfields. Though the chiropractic treatment that Verlezza and SRC Plainfields purportedly had provided supposedly had been ineffective in resolving WC's putative symptoms, Massoud nonetheless referred WC back to Verlezza and SRC Plainfields for continued treatment at the conclusion of August 18, 2016 examination. This medically unnecessary return referral to Verlezza and SRC Plainfields was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(vi)  On June 17, 2016, an Insured named LA was involved in an automobile accident. Thereafter, LA sought treatment from Verlezza and SRC Plainfields, who provided LA with chiropractic treatment between June 2016 and January 2017. In January 2017, Verlezza and SRC Plainfields caused LA to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Verlezza and SRC Plainfields. Thereafter, on January 12, 2017, Massoud purported to examine LA on behalf of Oasis. In his January 12, 2017 examination report, Massoud falsely contended that LA continued to suffer from pain in her shoulder and back as the result of her accident, despite the fact that – by that point – LA had received six months of chiropractic services from Verlezza and SRC Plainfields. Though the chiropractic treatment that Verlezza and SRC Plainfields purportedly had provided supposedly had been ineffective in resolving LA's putative symptoms, Massoud nonetheless referred LA back to Verlezza and SRC Plainfields for continued treatment at the conclusion of January 12, 2017 examination. This medically unnecessary return referral to

24

Verlezza and SRC Plainfields was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(vii)     On July 6, 2016, an Insured named KR was involved in an automobile accident. Thereafter, KR sought treatment from Belverio and Premier, who provided KR with chiropractic treatment between August 2016 and October 2016. In October 2016, Belverio and Premier caused KR to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Belverio and Premier. Thereafter, on October 10, 2016, Johnson purported to examine KR on behalf of Oasis. In his October 10, 2016 examination report, Johnson falsely contended that KR continued to suffer from pain in his shoulder, hip, knee and toe as the result of his accident, despite the fact that – by that point – KR had received two months of chiropractic services from Belverio and Premier. Though the chiropractic treatment that Belverio and Premier purportedly had provided supposedly had been ineffective in resolving KR's putative symptoms, Johnson nonetheless referred KR back to Belverio and Premier for continued chiropractic treatment at the conclusion of the October 10, 2016 examination. This medically unnecessary return referral to Belverio and Premier was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(viii)    On August 26, 2016, an Insured named HV was involved in an automobile accident. Thereafter, HV sought treatment from Fotiou and First Care, who provided HV with chiropractic treatment between September 19, 2016 and January 2017. In January 2017, Fotiou and First Care caused HV to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Fotiou and First Care. Thereafter, on January 17, 2017, Daniel purported to examine HV on behalf of Oasis. In his January 17, 2017 examination report, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – falsely contended that HV continued to suffer from pain in his shoulder and back as the result of his accident, despite the fact that – by that point – HV had received five months of chiropractic services from Fotiou and First Care. Though the chiropractic treatment that Fotiou and First Care purportedly had provided supposedly had been ineffective in resolving HV's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred HV back to Fotiou and First Care for continued chiropractic treatment at the conclusion of the January 17, 2017 examination. This medically unnecessary return referral to Fotiou and First Care was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(ix)     On September 20, 2016, an Insured named GT was involved in an automobile accident. Thereafter, GT sought treatment from Levine and South Orange, who provided GT with chiropractic treatment between September 2016 and March 2017. In March 2017, Levine and South Orange caused GT to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon

information and belief - Johnson, Patel, and Wheeler paid to Levine and South Orange. Thereafter, on March 21, 2017, Johnson purported to examine GT on behalf of Oasis. In his March 21, 2017 examination report, Johnson falsely contended that GT continued to suffer from pain in her shoulder as the result of her accident, despite the fact that – by that point – GT had received six months of chiropractic services from South Orange. Though the chiropractic treatment that South Orange purportedly had provided supposedly had been ineffective in resolving GT's putative symptoms, Johnson nonetheless referred GT back to South Orange for continued treatment at the conclusion of March 21, 2017 examination. This medically unnecessary return referral to South Orange was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(x)     On January 14, 2017, an Insured named RD was involved in an automobile accident. Thereafter, RD sought treatment from Belverio and Premier, who provided RD with chiropractic treatment between January 2017 and March 2017. In March 2017, Belverio and Premier caused RD to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Belverio and Premier. Thereafter, on March 8, 2017, Massoud purported to examine RD on behalf of Oasis. In his March 8, 2017 examination report, Massoud falsely contended that RD continued to suffer from pain in his shoulder and knee as the result of his accident, despite the fact that – by that point – RD had received two months of chiropractic services from Belverio and Premier. Though the chiropractic treatment that Belverio and Premier purportedly had provided supposedly had been ineffective in resolving RD's putative symptoms, Massoud nonetheless referred RD back to Belverio and Premier for continued chiropractic treatment at the conclusion of the March 8, 2017 examination. This medically unnecessary return referral to Belverio and Premier was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xi)    On January 21, 2017, an Insured named VT was involved in an automobile accident. Thereafter, VT sought treatment from Verlezza and SRC Oranges, who provided VT with chiropractic treatment between February 2017 and June 2017. In June 2017, Verlezza and SRC Oranges caused VT to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Verlezza and SRC Oranges. Thereafter on June 15, 2017, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – purported to examine VT on behalf of Oasis. In his June 15, 2017 examination report, Daniel falsely contended that VT continued to suffer from pain in his knee and shoulder as the result of his accident, despite the fact that – by that point – VT had received four months of chiropractic services from Verlezza and SRC Oranges. Though the chiropractic treatment that Verlezza and SRC Oranges purportedly had provided supposedly had been ineffective in resolving VT's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred VT back to Verlezza and SRC Oranges for continued treatment

at the conclusion of the June 15, 2017 examination. This medically unnecessary return referral to SRC Oranges was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xii)   On February 24, 2017, an Insured named AO was involved in an automobile accident. Thereafter, AO sought treatment from Fotiou and First Care, who provided AO with chiropractic treatment between March 2017 and October 2017. In October 2017, Fotiou and First Care caused AO to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Fotiou and First Care. Thereafter, on October 12, 2017, Daniel purported to examine AO on behalf of Oasis. In his October 12, 2017 examination report, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – falsely contended that AO continued to suffer from pain in her neck and back as the result of her accident, despite the fact that – by that point – AO had received seven months of chiropractic services from Fotiou and First Care. Though the chiropractic treatment that Fotiou and First Care purportedly had provided supposedly had been ineffective in resolving AO's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred AO back to Fotiou and First Care for continued treatment at the conclusion of October 12, 2017 examination. This medically unnecessary return referral to Fotiou and First Care was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xiii)  On April 2, 2017, an Insured named DH was involved in an automobile accident. Thereafter, DH sought treatment from Verlezza and SRC Oranges, who provided DH with chiropractic treatment between April 2017 and October 2017. In October 2017, Verlezza and SRC Oranges caused DH to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to SRC Oranges. Thereafter, on October 12, 2017, Patel purported to examine DH on behalf of Oasis. In his October 12, 2017 examination report, Patel falsely contended that DH continued to suffer from pain in her neck, back and knee as the result of her accident, despite the fact that – by that point – DH had received six months of chiropractic services from Verlezza and SRC Oranges. Though the chiropractic treatment that Verlezza and SRC Oranges purportedly had provided supposedly had been ineffective in resolving DH's putative symptoms, Patel nonetheless referred DH back to Verlezza and SRC Oranges for continued treatment at the conclusion of the October 12, 2017 examination. This medically unnecessary return referral to SRC Oranges was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xiv)   On April 4, 2017, an Insured named SC was involved in an automobile accident. Thereafter, SC sought treatment from Belverio and Premier, who provided SC with chiropractic treatment between April 2017 and October 2018. In October 2018, Belverio and Premier caused SC to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson,

Patel, and Wheeler paid to Belverio and Premier. Thereafter, on October 18, 2017, Patel purported to examine SC on behalf of Oasis. In his October 18, 2017 examination report, Patel falsely contended that SC continued to suffer from pain in her neck, back and knee as the result of her accident, despite the fact that – by that point – SC had received 18 months of chiropractic services from Belverio and Premier. Though the chiropractic treatment that Belverio and Premier purportedly had provided supposedly had been ineffective in resolving SC's putative symptoms, Patel nonetheless referred SC back to Belverio and Premier for continued chiropractic treatment at the conclusion of the October 18, 2017 examination. This medically unnecessary return referral to Belverio and Premier was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xv)   On April 7, 2017, an Insured named KS was involved in an automobile accident. Thereafter, KS sought treatment from Levine and South Orange, who provided KS with chiropractic treatment between May 2017 and June 2017. In June 2017, Levine and South Orange caused KS to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Levine and South Orange. Thereafter, on June 26, 2017, Johnson purported to examine KS on behalf of Oasis. In his June 26, 2017 examination report, Johnson falsely contended that KS continued to suffer from pain in her shoulder, hip and knee as the result of her accident, despite the fact that – by that point – KS had received two months of chiropractic services from South Orange. Though the chiropractic treatment that South Orange purportedly had provided supposedly had been ineffective in resolving KS's putative symptoms, Johnson nonetheless referred KS back to South Orange for continued treatment at the conclusion of June 26, 2017 examination. This medically unnecessary return referral to South Orange was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xvi)   On April 30, 2017, an Insured named VB was involved in an automobile accident. Thereafter, VB sought treatment from Fotiou and First Care, who provided VB with chiropractic treatment between May 2017 and September 2017. In September 2017, Fotiou and First Care caused VB to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Fotiou and First Care. Thereafter, on September 7, 2017, Daniel purported to examine VB on behalf of Oasis. In his September 7, 2017 examination report, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – falsely contended that VB continued to suffer from pain in his shoulder and knee as the result of his accident, despite the fact that – by that point – VB had received four months of chiropractic services from Fotiou and First Care. Though the chiropractic treatment that Fotiou and First Care purportedly had provided supposedly had been ineffective in resolving VB's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred VB back to Fotiou and First Care for continued treatment at the conclusion of

September 7, 2017 examination. This medically unnecessary return referral to Fotiou and First Care was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xvii)   On November 27, 2017, an Insured named EP was involved in an automobile accident. Thereafter, EP sought treatment from Belverio and Premier, who provided EP with chiropractic treatment between December 2017 and February 2018. In February 2018, Belverio and Premier caused EP to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Belverio and Premier. Thereafter, on February 15, 2018, Patel purported to examine EP on behalf of Oasis. In his February 15, 2018 examination report, Patel falsely contended that EP continued to suffer from pain in her neck, back and knee as the result of her accident, despite the fact that – by that point – EP had received two months of chiropractic services from Belverio and Premier. Though the chiropractic treatment that Belverio and Premier purportedly had provided supposedly had been ineffective in resolving EP's putative symptoms, Patel nonetheless referred EP back to Belverio and Premier for continued chiropractic treatment at the conclusion of the February 15, 2018 examination. This medically unnecessary return referral to Belverio and Premier was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xviii)   On March 19, 2018, an Insured named SO was involved in an automobile accident. Thereafter, SO sought treatment from Verlezza and SRC Plainfields, who provided SO with chiropractic treatment between April 2018 and June 2018. In June 2018, Verlezza and SRC Plainfields caused SO to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Verlezza and SRC Plainfields. Thereafter, on June 27, 2018, Daniel purported to examine SO on behalf of Oasis. In his June 27, 2018 examination report, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – falsely contended that SO continued to suffer from pain in her knee, neck, shoulder, and back as the result of her accident, despite the fact that – by that point – SO had received three months of chiropractic services from Verlezza and SRC Plainfields. Though the chiropractic treatment that Verlezza and SRC Plainfields purportedly had provided supposedly had been ineffective in resolving SO's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred SO back to Verlezza and SRC Plainfields for continued treatment at the conclusion of June 27, 2018 examination. This medically unnecessary return referral to Verlezza and SRC Plainfields was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xix)   On March 19, 2018, an Insured named AF was involved in an automobile accident. Thereafter, AF sought treatment from Verlezza and SRC Plainfields, who provided AF with chiropractic treatment between April 2018 and June 2018. In June 2018, Verlezza and SRC Plainfields caused AF to be referred to Oasis in exchange for

unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Verlezza and SRC Plainfields. Thereafter, on June 14, 2018, Patel purported to examine AF on behalf of Oasis. In his June 14, 2018 examination report, Patel falsely contended that AF continued to suffer from pain in his back and shoulder as the result of his accident, despite the fact that – by that point – AF had received three months of chiropractic services from Verlezza and SRC Plainfields. Though the chiropractic treatment that Verlezza and SRC Plainfields purportedly had provided supposedly had been ineffective in resolving AF's putative symptoms, Patel nonetheless referred AF back to Verlezza and SRC Plainfields for continued treatment at the conclusion of June 14, 2018 examination. This medically unnecessary return referral to Verlezza and SRC Plainfields was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

(xx)    On October 26, 2018, an Insured named MR was involved in an automobile accident. Thereafter, MR sought treatment from Verlezza and SRC Plainfields, who provided MR with chiropractic treatment between October 2018 and January 2019. In January 2019, Verlezza and SRC Plainfields caused MR to be referred to Oasis in exchange for unlawful compensation that Oasis, Massoud, and - upon information and belief - Johnson, Patel, and Wheeler paid to Verlezza and SRC Plainfields. Thereafter, on January 17, 2019, Daniel purported to examine MR on behalf of Oasis. In his January 17, 2019 examination report, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – falsely contended that MR continued to suffer from pain in his neck and back as the result of his accident, despite the fact that – by that point – MR had received three months of chiropractic services from Verlezza and SRC Plainfields. Though the chiropractic treatment that Verlezza and SRC Plainfields purportedly had provided supposedly had been ineffective in resolving MR's putative symptoms, Daniel – at the direction of Oasis, Massoud, and upon information and belief Johnson, Patel, and Wheeler – nonetheless referred MR back to Verlezza and SRC Plainfields for continued treatment at the conclusion of January 17, 2019 examination. This medically unnecessary return referral to Verlezza and SRC Plainfields was additional, unlawful compensation for the initial, medically unnecessary referral to Oasis.

107.    These are only representative examples. In the claims identified in Exhibit "1", Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler, routinely provided and received unlawful compensation in exchange for patient referrals.

108.    In the claims identified in Exhibit "1", Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely represented that Oasis was in compliance with all

significant laws governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits in the first instance.

109.    In fact, Oasis was not in compliance with all significant laws and regulations governing healthcare practice in New Jersey, and was not eligible to collect PIP Benefits in the first instance, inasmuch as it provided and received unlawful compensation in exchange for patient referrals.

**B.    The Concealment of the Unlawful Compensation in Exchange for Patient Referrals and the Pervasive Violations of N.J.A.C. 13:35-6.1(h)**

110.    As set forth above, N.J.A.C. 13:35-6.1(h) requires physicians and medical practices to set forth – in their billing and treatment reports – the actual locations where the underlying healthcare services were performed.

111.    As set forth above, this regulation was adopted to prevent medical practices such as Oasis from concealing the fact that they operate on an itinerant basis from the offices of their referral sources because – among other things – such concealment tends to obstruct insurance fraud investigations.

112.    Upon information and belief, in the claims that are identified in Exhibit "1", Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler routinely falsely listed Oasis's own offices at 85 Harristown Road, Suite 103, Glen Rock, New Jersey and 950 West Chestnut Street, Union, New Jersey as the locations where they purported to provide many of their patient examinations and electrodiagnostic tests.

113.    In actuality, however, the purported patient examinations and electrodiagnostic tests frequently were performed – to the extent that they were performed at all – at the offices of Referral Sources, pursuant to the Defendants' unlawful referral arrangements.

114.    For example:

(i)     On February 3, 2016, Massoud purported to perform an initial examination of an Insured named LA. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at Newark Pain, pursuant to the Defendants' unlawful referral arrangement.

(ii)    On July 11, 2016, Wheeler purported to perform an initial examination of an Insured named MD. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at Essex Valley, pursuant to the Defendants' unlawful referral arrangement.

(iii)   On August 26, 2016, Johnson purported to perform an examination of an Insured named BC. The resulting bill falsely listed Oasis' Union, New Jersey Office as the treatment location and the resulting treatment report did not list any address for the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at SRC Plainfields, pursuant to the Defendants' unlawful referral arrangement.

(iv)    On September 19, 2016, Massoud purported to perform an initial examination of an Insured named JA. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at Premier, pursuant to the Defendants' unlawful referral arrangement.

(v)     On September 28, 2016, Daniel purported to perform an initial examination of an Insured named CN. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at First Care, pursuant to the Defendants' unlawful referral arrangement.

(vi)    On January 12, 2017, Massoud purported to perform an initial examination of an Insured named BH. The resulting treatment report listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at SRC Plainfields, pursuant to the Defendants' unlawful referral arrangement.

(vii)   On January 12, 2017, Daniel purported to perform an initial examination of an Insured named SO. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at SRC Plainfields, pursuant to the Defendants' unlawful referral arrangement.

(viii)  On February 16, 2017, Massoud purported to perform an examination of an Insured named GF. The resulting bill falsely listed Oasis' Union, New Jersey office as the treatment location and the resulting treatment report listed Oasis' Glen Rock, New

Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at SRC Plainfields, pursuant to the Defendants' unlawful referral arrangement.

(ix)     On September 7, 2017, Daniel purported to perform an initial examination of an Insured named VB. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at First Care, pursuant to the Defendants' unlawful referral arrangement.

(x)      On September 19, 2017, Johnson purported to perform an initial examination of an Insured named KW. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at Premier, pursuant to the Defendants' unlawful referral arrangement.

(xi)     On October 12, 2017, Daniel purported to perform an initial examination of an Insured named AO. The resulting bill and treatment report falsely listed Oasis' Union, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at First Care, pursuant to the Defendants' unlawful referral arrangement.

(xii)    On May 7, 2018, Patel purported to perform an initial examination of an Insured named AC. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at Premier, pursuant to the Defendants' unlawful referral arrangement.

(xiii)   On July 30, 2018, Johnson purported to perform an initial examination of an Insured named TW. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at Premier, pursuant to the Defendants' unlawful referral arrangement.

(xiv)    On December 3, 2018, Patel purported to perform an initial examination of an Insured named BB. The resulting bill and treatment report falsely listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at Premier, pursuant to the Defendants' unlawful referral arrangement.

(xv)     On April 25, 2019, Patel purported to perform an examination of an Insured named MR. The resulting bill falsely listed Oasis' Union, New Jersey office as the treatment location and the resulting treatment report listed Oasis' Glen Rock, New Jersey office as the treatment location. In fact, the initial examination was performed – to the extent that it was performed at all – at SRC Plainfields, pursuant to the Defendants' unlawful referral arrangement.

115.    These are only representative examples. Upon information and belief, in the claims identified in Exhibit "1", Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler routinely falsely listed Oasis' offices as the treatment locations in their billing and treatment reports. In fact, to the extent that the examinations were performed in the first instance, they were performed at the Referral Sources' offices, pursuant to the Defendants' unlawful referral arrangements.

116.    In keeping with the fact that Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' offices as the treatment locations in their billing and treatment reports, Oasis routinely purported to provide examinations or electrodiagnostic testing to several patients being seen by the Referral Sources on individual dates, and then falsely listed Oasis's own offices as the treatment locations on the resulting billing and treatment reports.

117.    For example:

(i)     On December 16, 2015 Oasis purported to provide an intial examination to an Insured who had been treating at First Care, DT, and further purported to provide an initial examination to another Insured who also had been treating at First Care, MC. That same day, Foutiou and First Care also purported to provide treatment to DT and MC at First Care's office in Trenton, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Glen Rock, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at First Care's office.

(ii)    On August 26, 2016 Oasis purported to provide an initial examination to an Insured who had been treating at SRC Plainfields, CG, and further purported to provide an examination to two Insureds who also had been treating at SRC Plainfields, EG and BC. That same day, Verlezza and SRC Plainfields also purported to provide treatment to CG, EG and BC at SRC Plainfield's office in Plainfield, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Union, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at SRC Plainfield's office.

34

(iii)    On October 12, 2017 Oasis purported to provide an examination to an Insured who had been treating at SRC Plainfields, JR, and further purported to provide an examination to another Insured who also had been treating at SRC Plainfields, LS. That same day, Verlezza and SRC Plainfields also purported to provide treatment to JR and LS at SRC Plainfield's office in Plainfield, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Union, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at SRC Plainfield's office.

(iv)    On February 22, 2018 Oasis purported to provide an initial examination to an Insured who had been treating at SRC Plainfields, SM, and further purported to provide an examination to another Insured who also had been treating at SRC Plainfields, LS. That same day, Verlezza and SRC Plainfields also purported to provide treatment to SM and LS at SRC Plainfield's office in Plainfield, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Union, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at SRC Plainfield's office.

(v)    On May 17, 2018 Oasis purported to provide an examination to an Insured who had been treating at Newark Pain, DM, and further purported to provide an examination to another Insured who also had been treating at Newark Pain, KB. That same day, Saraceno and Newark Pain also purported to provide treatment to DM and KB at Newark Pain's office in Newark, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Newark, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at Newark Pain's office.

(vi)    On July 9, 2018, Oasis purported to provide an examination to an Insured who had been treating at Premier, GG, and further purported to provide follow-up examinations to another Insured who also had been treating at Premier, SJ. That same day, Belverio and Premier also purported to provide treatment to GG and SJ at Premier's office in Montclair, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Glen Rock, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at Premier's office.

(vii)    On August 7, 2018 Oasis purported to provide an examination to an Insured who had been treating at Newark Pain, LD, and further purported to provide an examination to another Insured who also had been treating at Newark Pain, KS. That same day, Saraceno and Newark Pain also purported to provide treatment to

LD and KS at Newark Pain's office in Newark, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Glen Rock, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at Newark Pain's office.

(viii)   On August 16, 2018, Oasis purported to provide an examination to an Insured who had been treating at Premier, RM, and further purported to provide a follow-up examination to another Insured who also had been treating at Premier, RM. That same day, Belverio and Premier also purported to provide treatment to RM and RM at Premier's office in Montclair, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Union, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at Premier's office.

(ix)   On September 5, 2018 Oasis purported to provide an initial examination to an Insured who had been treating at Newark Pain, YM, and further purported to provide an initial examination to another Insured who also had been treating at Newark Pain, MA. That same day, Saraceno and Newark Pain also purported to provide treatment to YM and MA at Newark Pain's office in Newark, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Union, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at Newark Pain's office.

(x)   On October 26, 2018 Oasis purported to provide an examination to an Insured who had been treating at South Orange, MG, and further purported to provide a follow-up examination to another Insured who also had been treating at South Orange, DP. That same day, Levine and South Orange also purported to provide treatment to MG and DP at South Orange's office in South Orange, New Jersey. To conceal their unlawful referral arrangement, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely listed Oasis' Glen Rock, New Jersey office as the treatment location for the examinations. In fact, the examinations were all conducted – to the extent that they were conducted at all – at South Orange's office.

118.   These are only representative examples. In the claims identified in Exhibit "1", Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler often deliberately falsified their treatment locations in their billing and treatment reports in order to conceal the Defendants' unlawful referral arrangements.

119.    Each time Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler falsely represented their treatment locations in their billing and treatment reports constituted a separate violation of N.J.A.C. 13:35-6.1(h).

**C.    The Defendants' Fraudulent Treatment and Billing Protocol**

120.    In the claims identified in Exhibit "1", the vast majority of the Insureds whom the Defendants purported to treat were involved in relatively minor accidents, to the extent that they were involved in any actual accidents at all.

121.    In keeping with the fact that the vast majority of the Insureds in the claims identified in Exhibit "1" were involved in relatively minor accidents, in most of the claims identified in Exhibit "1", the Insureds did not seek treatment at any hospital as the result of their accidents.

122.    To the limited extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

123.    Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

124.    Concomitantly, almost none of the Insureds whom the Defendants purported to treat, or that were referred pursuant to the Defendants' unlawful referral and kickback scheme, suffered from any significant injuries or health problems at all as a result of the relatively minor accidents they experienced or purported to experience.

125.    Even so, the Defendants purported to subject most Insureds to a medically unnecessary course of "treatment" that was provided pursuant to a pre–determined, fraudulent

protocol designed to maximize the billing that the Defendants and their referral sources – including the Referral Sources – could submit or cause to be submitted to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

126.    The Defendants purported to provide their pre–determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentation, or – in most cases – the total absence of any serious medical problems arising from any actual automobile accidents.

127.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants and their referral sources to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

128.    No legitimate physician, medical practice, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his, her, or its auspices.

129.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

**1.      The Fraudulent Initial Examinations**

130.    Upon receiving an illegal referral pursuant to the unlawful compensation that Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided to the Referral Sources, Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud purported to provide virtually every Insured in the claims identified in Exhibit "1" with an initial examination.

131.    As set forth in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud billed a considerable amount of the initial examinations through Oasis to GEICO under CPT code 99204, typically resulting in charges of $193.64 per examination, amd umder CPT code 99244, typically resulting in charges of $387.00 per examination.

132.    In the claims for initial examinations and consultations identified in Exhibit "1", the charges for the initial examinations were fraudulent in that they misrepresented Oasis' eligibility to collect PIP Benefits in the first instance.

133.    In fact, Oasis never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because – as a result of the fraudulent scheme described herein – neither Oasis nor the examinations was in compliance with all significant laws and regulations governing healthcare practice.

134.    The charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and reimbursable amounts for the initial examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

135.    In the claims for initial examinations under CPT Codes 99204 and 99244 that are identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely misrepresented the severity of the Insureds' presenting problems.

136.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT codes 99204 and 99244 to bill for an initial patient examination or consultation typically requires that the Insured present with problems of moderate to high severity.

137.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT codes 99204 and 99244 to bill for an initial patient examination.

138.    For example, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99204 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)    Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)   Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

139.    Similarly, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99244 to bill for an initial patient examination:

(i)     Office consultation with 38–year–old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra–abdominal abscess. (Colon and Rectal Surgery)

(ii)    Initial office consultation for discussion of treatment options for a 40–year–old female with a two–centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii)   Initial office consultation with 72–year–old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

140.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT codes 99204 and 99244 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

141.    By contrast, to the limited extent that the Insureds in the claims identified in Exhibit "1" had any presenting problems at all as the result of their relatively minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as acute sprains and strains.

142.    Even so, in the claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely billed for their putative initial examinations using CPT codes 99204 and 99244, and thereby falsely represented that the Insureds presented with problems of moderate to high severity.

143.    For example:

(i)    On December 23, 2015, an Insured named RO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that RO was not injured and did not complain of any pain at the scene. In keeping with the fact that RO was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that RO experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of RO by Johnson on May 13, 2016 – four months after the accident – Oasis and Johnson billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(ii)    On June 17, 2016, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had

completely resolved within two to three months of the accident. Even so, following a purported initial examination of MC by Patel on October 19, 2016 – four months after the accident – Oasis and Patel billed GEICO for the initial examination using CPT code 99244, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(iii)     On July 6, 2016, an Insured named KR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, side-impact collision and that KR's vehicle was drivable following the accident. The police report further indicated that KR was not injured and did not complain of any pain at the scene. In keeping with the fact that KR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that KR experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of KR by Johnson on October 10, 2016 – three months after the accident – Oasis and Johnson billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(iv)     On September 3, 2016, an Insured named NB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that NB was not injured and did not complain of any pain at the scene. In keeping with the fact that NB was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that NB experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of NB by Wheeler on January 27, 2017 – four months after the accident – Oasis and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(v)     On September 29, 2016, an Insured named TC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that TC was not injured and did not complain of any pain at the scene. In keeping with the fact that TC was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that TC experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of TC by Massoud on February 2, 2017 – four months after the accident – Oasis and Massoud billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(vi)     On January 14, 2017, an Insured named RD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that RD was not injured and did not complain of any pain at the scene. In keeping with the fact that RD was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that RD experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of RD by Massoud on March 8, 2017 – three months after the accident – Oasis and Massoud billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(vii)    On June 8, 2018, an Insured named RT was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that RT was not injured and did not complain of any pain at the scene. In keeping with the fact that RT was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that RT experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of RT by Patel on January 14, 2019 – over six months after the accident – Oasis and Patel billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(viii)   On June 15, 2018, an Insured named TS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that TS was not injured and did not complain of any pain at the scene. In keeping with the fact that TS was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that TS experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of TS by Patel on October 11, 2018 – four months after the accident – Oasis and Patel billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(ix)     On July 8, 2018, an Insured named RL was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, side-impact collision and that RL's vehicle was drivable following the accident. In keeping with the fact that RL was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that RL experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of

the accident. Even so, following a purported initial examination of RL by Patel on January 29, 2019 – more than six months after the accident – Oasis and Patel billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

(x)     On September 29, 2018, an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact, collision. The police report further indicated that RS was not injured and did not complain of any pain at the scene. In keeping with the fact that RS was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that RS experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so, following a purported initial examination of RS by Wheeler on December 13, 2018 – two and a half months after the accident – Oasis and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that the initial examination involved moderately to highly severe presenting problems.

144.     These are only representative examples. In the vast majority of the claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud falsely represented that the Insureds presented with problems of moderate to high severity when in fact the Insureds' problems were low severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

145.     In the claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for their charges for examinations under CPT codes 99204 and 99244, because examinations billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

146.     In the claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely falsely represented that the Insureds presented with problems of moderate to high severity in order to create a false basis for

the electrodiagnostic testing and interventional pain management services that the Defendants purported to provide to the Insureds, and also to create a false basis for continued, medically unnecessary chiropractic services by their referral sources.

**b.     Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

147.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination typically represents that the physician who performed the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

148.    Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for an initial examination typically represents that the physician who performed the examination spent at least 60 minutes of face-to-face time with the patient or the patient's family.

149.    As set forth in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud submitted virtually all of their billing for initial examinations under CPT codes 99204 or 99244, and thereby represented that the physicians who purported to perform the initial examinations spent either 45 minutes or 60 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

150.    In fact, in the claims for initial examinations identified in Exhibit "1", neither Johnson, Patel, Schenker, Wheeler, Daniel, Massoud, nor any other physician or healthcare provider associated with Oasis, ever spent 45 minutes – let alone 60 minutes – of face-to-face time with the Insureds or their families when conducting the examinations and consultations.

151.    Rather, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not entail more than 15 minutes of face-to-face time between the examining physicians and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

152. The only face-to-face time between the examining physicians and the Insureds that was reflected in the limited range of examination parameters set forth in the Defendants' examination reports consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

153. These brief interviews and limited examinations did not require Johnson, Patel, Schenker, Wheeler, Daniel, Massoud, or any other physician or healthcare provider associated with Oasis, to spend more than 15 minutes of face-to-face time with the Insureds or their families.

154. In the claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud falsely represented that the examinations involved either 45 minutes or 60 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT codes 99204 and 99244 because examinations billable under CPT codes 99204 and 99244 are reimbursable at a higher rate than examinations that require less time to perform.

c. **Misrepresentations Regarding "Comprehensive" Physical Examinations**

155. Moreover, pursuant to the Fee Schedule, the use of CPT codes 99204 and 99244 to bill for an initial patient examination represents that the physician who performed the examination conducted a "comprehensive" physical examination.

156. According to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

157.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a general examination of multiple patient organ systems unless the physician has documented findings with respect to a least eight organ systems.

158.    The CPT Assistant recognizes the following organ systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)     gastrointestinal;

(vii)    genitourinary;

(viii)   musculoskeletal;

(ix)     integumentary (skin and/or breast);

(x)      neurological;

(xi)     psychiatric;

(xii)    endocrine;

(xiii)   hematologic/lymphatic; and

(xiv)    allergic/immunologic.

159.    To the extent that the Insureds in the claims identified in Exhibit "1" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

160.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café–au–lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

161.    In the claims for initial examinations identified in Exhibit "1" that purportedly were provided by Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud, when Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud billed for the initial patient examinations under CPT codes 99204 and 99244, they falsely represented that they provided a "comprehensive" patient examination to the Insureds they purported to treat during the initial examinations.

162.    In fact, with respect to the claims for initial examinations identified in Exhibit "1", neither Johnson, Patel, Wheeler, Schenker, Masri, Daniel, Massoud, nor any other physician associated with Oasis, ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

163.    For instance, in each of the claims for initial examinations identified in Exhibit "1", neither Johnson, Patel, Wheeler, Schenker, Masri, Daniel, Massoud, nor any other physician associated with Oasis, ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

164.    Furthermore, although Oasis, Johnson, Patel, Schenker, Masri, Massoud, Daniel, and Wheeler often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems during the initial examinations in the claims identified in Exhibit "1", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café–au–lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)    coordination, deep tendon reflexes, and sensation; and/or

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

165.    For example:

(i)    On October 7, 2015, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO under CPT code 99204 for an initial examination that Massoud purported to perform on an Insured named BM, and thereby represented that they had provided a "comprehensive" physical examination to BM. However, Massoud did not document findings with respect to at least eight of BM's organ systems, nor did he document a complete examination of BM's musculoskeletal system, despite the fact that – to the extent that BM had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(ii)    On April 20, 2016, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO under CPT code 99204 for an initial examination that Massoud purported to perform on an Insured named JL, and thereby represented that they had provided a "comprehensive" physical examination to JL. However, Massoud did not document findings with respect to at least eight of JL's organ systems, nor did he document a complete examination of JL's musculoskeletal system, despite the fact that – to the extent that JL had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(iii)    On September 21, 2016, Wheeler, Massoud, Oasis, and – upon information and belief – Johnson and Patel billed GEICO under CPT code 99204 for an initial examination that Wheeler purported to perform on an Insured named SR, and thereby represented that they had provided a "comprehensive" physical examination to SR. However, Wheeler did not document findings with respect to at least eight of SR's organ systems, nor did he document a complete examination of SR's musculoskeletal system, despite the fact that – to the extent that SR had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(iv)    On January 11, 2018, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO under CPT code 99204 for an initial examination that Massoud purported to perform on an Insured named JB, and thereby represented that they had provided a "comprehensive" physical examination to JB. However, Massoud did not document findings with respect to at least eight of JB's organ systems, nor did he document a complete examination of JB's musculoskeletal system, despite the fact that – to the extent that JB had any

complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(v)     On June 14, 2018, Patel, Massoud, Oasis, and – upon information and belief – Johnson and Wheeler billed GEICO under CPT code 99204 for an initial examination that Patel purported to perform on an Insured named MT, and thereby represented that they had provided a "comprehensive" physical examination to MT. However, Patel did not document findings with respect to at least eight of MT's organ systems, nor did he document a complete examination of MT's musculoskeletal system, despite the fact that – to the extent that MT had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(vi)    On October 12, 2018, Johnson, Massoud, Oasis, and – upon information and belief – Patel and Wheeler billed GEICO under CPT code 99204 for an initial examination that Johnson purported to perform on an Insured named TF, and thereby represented that they had provided a "comprehensive" physical examination to TF. However, Johnson did not document findings with respect to at least eight of TF's organ systems, nor did he document a complete examination of TF's musculoskeletal system, despite the fact that – to the extent that TF had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(vii)   On December 26, 2018, Patel, Massoud, Oasis, and – upon information and belief – Johnson and Wheeler billed GEICO under CPT code 99204 for an initial examination that Patel purported to perform on an Insured named JV, and thereby represented that they had provided a "comprehensive" physical examination to JV. However, Patel did not document findings with respect to at least eight of JV's organ systems, nor did he document a complete examination of JV's musculoskeletal system, despite the fact that – to the extent that JV had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(viii)  On January 7, 2019, Wheeler, Massoud, Oasis, and – upon information and belief – Johnson and Patel billed GEICO under CPT code 99204 for an initial examination that Wheeler purported to perform on an Insured named LA, and thereby represented that they had provided a "comprehensive" physical examination to LA. However, Wheeler did not document findings with respect to at least eight of LA's organ systems, nor did he document a complete examination of LA's musculoskeletal system, despite the fact that – to the extent that LA had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(ix)    On January 14, 2019, Patel, Massoud, Oasis, and – upon information and belief – Johnson and Wheeler billed GEICO under CPT code 99204 for an initial examination that Patel purported to perform on an Insured named RT, and thereby

represented that they had provided a "comprehensive" physical examination to RT. However, Patel did not document findings with respect to at least eight of RT's organ systems, nor did he document a complete examination of RT's musculoskeletal system, despite the fact that – to the extent that RT had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

(x) On February 6, 2019, Patel, Massoud, Oasis, and – upon information and belief – Johnson and Wheeler billed GEICO under CPT code 99204 for an initial examination that Patel purported to perform on an Insured named JA, and thereby represented that they had provided a "comprehensive" physical examination to JA. However, Patel did not document findings with respect to at least eight of JA's organ systems, nor did he document a complete examination of JA's musculoskeletal system, despite the fact that – to the extent that JA had any complaints at all as a result of the automobile accident – they were limited to musculoskeletal complaints.

166. These are only representative examples. In the claims for initial examinations under CPT codes 99204 and 99244 that are identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely falsely represented that they had provided "comprehensive" physical examinations, when in fact they had not.

167. In the claims for initial examinations under CPT codes 99204 and 99244 that are identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT codes 99204 and 99244, because examinations billable under CPT codes 99204 and 99244 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" physical examinations.

**d.  Misrepresentations Regarding the Extent of Medical Decision-Making**

168. Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for a patient examination represents that the physician who performed the examination engaged in medical decision-making of "moderate complexity".

169.     Pursuant to the Fee Schedule, the use of CPT code 99244 to bill for a patient examination represents that the physician who performed the examination engaged in medical decision-making of "moderate complexity".

170.     Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co–morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

171.     The CPT Assistant provides various clinical examples of the types of presenting problems that would require "moderate complexity" medical decision-making, so as to justify a charge under CPT codes 99204 or 99244.

172.     For example, the CPT Assistant provides the following clinical examples of presenting problems that support the legitimately could require moderately complex medical decision-making, and would support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)     Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

     (v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

     (vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

     (vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

173.    Similarly, the CPT Assistant provides the following clinical examples of presenting problems that support the use of CPT code 99244 to bill for an initial patient examination:

     (i)     Office consultation with 38–year–old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra–abdominal abscess. (Colon and Rectal Surgery)

     (ii)    Initial office consultation for discussion of treatment options for a 40–year–old female with a two–centimeter adenocarcinoma of the breast. (Radiation Oncology)

     (iii)   Initial office consultation with 72–year–old male with esophageal carcinoma, symptoms of dysphagia and reflux. (Thoracic Surgery)

174.    Accordingly, pursuant to the CPT Assistant, the presenting problems that could require moderately complex medical decision-making, and therefore support the use of CPT codes 99204 and 99244 to bill for an initial examination, typically are problems that pose a threat to the patient's health, or even the patient's life.

175.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "1", had any presenting problems at all as a result of their relatively minor automobile accidents, the problems generally consisted of minor soft tissue injuries such as sprains or strains.

176.    What is more, strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four–week, eight–week, and 13–week marks.

177.    By the time the Insureds in the claims identified in Exhibit "1" presented to the Defendants for putative initial examinations, the Insureds either did not have any genuine

presenting problems at all as the result of their relatively minor automobile accidents, or their presenting problems were of low or minimal severity.

178.    The diagnosis and treatment of these Insureds' minor injuries did not require any moderately complex medical decision-making.

179.    Though Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely billed for their putative initial examinations using CPT codes 99204 and 99244, and thereby falsely represented that the examinations involved "moderate complexity" medical decision-making, in fact the examinations did not involve any legitimate medical decision-making at all.

180.    First, in the claims for initial examinations identified in Exhibit "1", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

181.    When the Insureds in the claims identified in Exhibit "1" presented to Oasis for "treatment", they typically did not arrive with any medical records except, at times, basic radiology reports.

182.    Furthermore, prior to the initial examinations, Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud typically neither requested any medical records from any other providers, nor conducted any diagnostic tests except for occasional, basic radiology services such as x-rays.

183.    Second, in Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud's claims for initial examinations identified in Exhibit "1", there was no risk of significant complication or morbidity – much less mortality – from the Insureds' minor soft–tissue injury

complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

184.    Nor, by extension, was there any risk of significant complication, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

185.    In most cases, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to medically unnecessary electrodiagnostic testing, which was not health– or life–threatening if properly administered.

186.    Third, in Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud's claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud did not consider any significant number of diagnoses or treatment options for the Insureds during the initial examinations.

187.    Rather, to the extent that the initial examinations were conducted in the first instance, Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud provided substantially similar, pre–determined phony soft–tissue injury "diagnoses" for virtually every Insured, and prescribed a substantially similar course of treatment for every Insured.

188.    Specifically, in the vast majority of claims identified in Exhibit "1", during the initial examinations the Insureds did not report any serious continuing medical problems that legitimately could be traced to an underlying automobile accident.

189.    Even so, Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud prepared initial examination reports in which they provided a phony list of soft tissue injury "diagnoses" to virtually every Insured.

190.    Then, Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud issued these phony "diagnoses" not only to create a false basis for their own medically unnecessary electrodiagnostic testing and unlawful self-referrals, but also to create a false basis for continued, medically unnecessary chiropractic services by their referral sources, regardless of the Insureds' individual circumstances or presentation.

191.    For example:

(i)     On November 7, 2015, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, front-end collision and that MG's vehicle was drivable following the accident. The police report further indicated that MG did not complain of pain at the scene and refused medical treatment. In keeping with the fact that MG was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, Massoud purported to conduct an initial examination of MG on June 23, 2016. Massoud did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Massoud did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Massoud provided MG with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Massoud and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Massoud and Oasis consisted of medically unnecessary chiropractic services which did not pose the least bit of risk to MG. Even so, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Massoud engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ii)    On February 29, 2016, an Insured named MG was a passenger involved in an automobile accident. The contemporaneous police report indicated that MG complained of knee pain at the scene but refused medical treatment. In keeping with the fact that MG was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a year of the accident. Even so, Massoud purported to conduct an initial examination of MG on February 29, 2016.

Massoud did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Massoud did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Massoud provided MG with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MG's presenting problems, nor the treatment plan provided to MG by Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, MG did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Massoud, and Oasis consisted of medically unnecessary chiropractic services and electrodiagnostic testing which did not pose the least bit of risk to MG. Even so, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Massoud engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iii)   On June 9, 2016, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that TK complained of shoulder pain at the scene but refused medical treatment. In keeping with the fact that TK was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that TK experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few weeks of the accident. Even so, Massoud purported to conduct an initial examination of TK on June 22, 2016. Massoud did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Massoud did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Massoud provided TK with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TK's presenting problems, nor the treatment plan provided to TK by Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, TK did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Massoud, and Oasis consisted of medically unnecessary chiropractic services and electrodiagnostic testing which did not pose the least bit of risk to TK. Even so, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Massoud engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(iv)   On September 2, 2016, an Insured named SR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, side-swipe collision and that SR's vehicle was drivable following the accident. The police report further indicated that SR was not injured and did not

complain of any injury at the scene. In keeping with the fact that SR was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that SR experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few weeks of the accident. Even so, Wheeler purported to conduct an initial examination of SR on September 21, 2016. Wheeler did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Wheeler did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Wheeler provided SR with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SR's presenting problems, nor the treatment plan provided to SR by Wheeler, Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, SR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Wheeler, Massoud, and Oasis consisted of pain medication and a referral for chiropractic services, none of which posed the least bit of risk to SR. Even so, Wheeler, Massoud, Oasis, and – upon information and belief – Johnson and Patel billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Wheeler engaged in some legitimate, high complexity medical decision-making during the purported examination.

(v)     On January 11, 2017, an Insured named WD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, rear-end collision and that WD's vehicle was drivable following the accident. The police report further indicated that WD was not injured and did not complain of any injury at the scene. In keeping with the fact that WD was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that WD experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few weeks of the accident. Even so, Massoud purported to conduct an initial examination of WD on January 11, 2017. Wheeler did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Massoud did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Massoud provided WD with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither WD's presenting problems, nor the treatment plan provided to WD by Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, WD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Wheeler, Massoud, and Oasis consisted of pain medication and a referral for chiropractic services and medically unnecessary electrodiagnostic testing, none of which posed the least bit of risk to WD. Even so, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely

represented that Massoud engaged in some legitimate, high complexity medical decision-making during the purported examination.

(vi)     On April 20, 2017, an Insured named BD was involved in an automobile accident. The contemporaneous police report indicated that BD did not complain of pain at the scene and refused medical treatment. In keeping with the fact that BD was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that BD experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few weeks of the accident. Even so, Massoud purported to conduct an initial examination of BD on June 21, 2017. Massoud did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Massoud did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Massoud provided BD with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BD's presenting problems, nor the treatment plan provided to BD by Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, BD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Massoud, and Oasis consisted of medically unnecessary chiropractic services, and electrodiagnostic testing which did not pose the least bit of risk to BD. Even so, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Massoud engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(vii)    On April 30, 2017, an Insured named VB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a a low-impact, rear-end collision and that VB's vehicle was drivable following the accident. The police report further indicated that VB did complain of back pain at the scene and refused medical treatment. In keeping with the fact that VB was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that VB experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, Daniel purported to conduct an initial examination of VB on September 7, 2017. Daniel did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Daniel did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Daniel provided VB with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither VB's presenting problems, nor the treatment plan provided to VB by Daniel, Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, VB did not need any extensive treatment at all as a result

of the accident, and the treatment plan provided by Daniel, Massoud, and Oasis consisted of medically unnecessary chiropractic services and injections which did not pose the least bit of risk to VB. Even so, Daniel, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Daniel engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(viii)   On July 8, 2018, an Insured named SM was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, side-swipe collision and that SM's vehicle was drivable following the accident. The police report further indicated that SM did not complain of pain or injury at the scene and refused medical treatment. In keeping with the fact that SM was not seriously injured, she did not visit any hospital emergency room following the accident. To the extent that SM experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few weeks of the accident. Even so, Johnson purported to conduct an initial examination of SM on August 9, 2018. Johnson did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Johnson did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Johnson provided SM with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither SM's presenting problems, nor the treatment plan provided to SM by Johnson, Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, SM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Johnson, Massoud, and Oasis consisted of medically unnecessary chiropractic services which did not pose the least bit of risk to SM. Even so, Johnson, Massoud, Oasis, and – upon information and belief – Patel and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Johnson engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(ix)   On August 24, 2018, an Insured named RH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-impact, front-end collision and that RH's vehicle was drivable following the accident. The police report further indicated that RH did complain of knee pain at the scene and refused medical treatment. In keeping with the fact that RH was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that RH experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, Patel purported to conduct an initial examination of RH on December 10, 2018. Patel did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Patel did not consider any significant

number of diagnoses or management options in connection with the examination. Instead, Patel provided RH with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RH's presenting problems, nor the treatment plan provided to RH by Patel, Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, RH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Patel, Massoud, and Oasis consisted of medically unnecessary chiropractic services which did not pose the least bit of risk to RH. Even so, Patel, Massoud, Oasis, and – upon information and belief – Johnson and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Patel engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

(x)     On October 26, 2018, an Insured named MR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a a low-impact, rear-end collision and that MR's vehicle was drivable following the accident. The police report further indicated that MR did not complain of pain or injury at the scene and refused medical treatment. In keeping with the fact that MR was not seriously injured, he did not visit any hospital emergency room following the accident. To the extent that MR experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset, and had completely resolved within a few months of the accident. Even so, Daniel purported to conduct an initial examination of MR on January 17, 2019. Daniel did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Daniel did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Daniel provided MR with the same, phony list of soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MR's presenting problems, nor the treatment plan provided to MR by Daniel, Massoud, and Oasis, presented any risk of significant complications, morbidity, or mortality. To the contrary, MR did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Daniel, Massoud, and Oasis consisted of medically unnecessary chiropractic services which did not pose the least bit of risk to MR. Even so, Daniel, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Daniel engaged in some legitimate, moderate complexity medical decision-making during the purported examination.

192.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

193.     An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

194.     As set forth above, in the claims identified in Exhibit "1", most of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender–bender" accidents, to the extent that they were involved in any actual accidents at all.

195.     It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

196.     It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting for initial examinations at Oasis with substantially identical injuries on or about the exact same dates after their accidents.

197.     Even so, in keeping with the fact that Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

198.     For example:

(i)     On March 18, 2013, two insureds – JZ and YC – were involved in the same automobile accident. Thereafter, JZ and YC presented – incredibly – on the exact same date, March 23, 2015, to Oasis for initial examinations by Massoud. JZ and YC were different ages, in different physical condition, and experienced the impact

from different locations in the vehicle. To the extent that JZ and YC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided JZ and YC with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)   On October 12, 2013, two insureds – MC and FC– were involved in the same automobile accident. Thereafter, MC and FC presented – incredibly – on the exact same date, August 5, 2015, to Oasis for initial examinations by Massoud. MC and FC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MC and FC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided MC and FC with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iii)   On October 10, 2014, two insureds – NG and CG – were involved in the same automobile accident. Thereafter, NG and CG presented – incredibly – on the exact same date, June 22, 2015, to Oasis for initial examinations by Massoud. NG and CG were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that NG and CG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided NG and CG with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)   On January 9, 2015, two insureds – JL and XS – were involved in the same automobile accident. Thereafter, JL and XS presented – incredibly – on the exact same date, April 27, 2015, to Oasis for initial examinations by Massoud. JL and XS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JL and XS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided XS and JL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(v)   On January 28, 2016, two insureds – EQ and AR – were involved in the same automobile accident. Thereafter, EQ and AR presented – incredibly – on the exact same date, November 16, 2016, to Oasis for initial examinations by Daniel. EQ and AR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EQ and AR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion

of the putative initial examinations, Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided EQ and AR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vi)     On May 20, 2016, two insureds – CB and BP – were involved in the same automobile accident. Thereafter, CB and BP presented – incredibly – on the exact same date, June 24, 2016, to Oasis for initial examinations by Johnson. CB and BP were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CB and BP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Johnson, Massoud, and – upon information and belief – Patel and Wheeler provided CB and BP with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(vii)    On July 1, 2016, six insureds – HI, JD, JDLC, MD, MDLC, and JR – were involved in the same automobile accident. Thereafter, HI, JD, JDLC, MD, MDLC, and JR presented – incredibly – on the exact same date, July 11, 2016, to Oasis for initial examinations by Wheeler. HI, JD, JDLC, MD, MDLC, and JR were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HI, JD, JDLC, MD, MDLC, and JR suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Wheeler, Massoud, and – upon information and belief – Patel and Johnson provided HI, JD, JDLC, MD, MDLC, and JR with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On July 17, 2016, three insureds – CG, KG, and RL – were involved in the same automobile accident. Thereafter, CG, KG, and RL presented – incredibly – on the exact same date, September 28, 2016, to Oasis for initial examinations by Massoud. CG, KG, and RL were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CG, KG, and RL suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided CG, KG, and RL with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)     On September 13, 2016, two insureds – MQ and JA – were involved in the same automobile accident. Thereafter, MQ and JA presented – incredibly – on the exact same date, June 19, 2017, to Oasis for initial examinations by Johnson. MQ and JA were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MQ and JA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Johnson, Massoud, and – upon

information and belief – Patel and Wheeler provided MQ and JA with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(x)     On October 5, 2016, two insureds – JG and CB – were involved in the same automobile accident. Thereafter, JG and CB presented – incredibly – <u>on the exact same date</u>, October 31, 2016, to Oasis for initial examinations by Massoud. JG and CB were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JG and CB suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided JG and CB with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xi)    On March 14, 2017, two insureds – CF and AF – were involved in the same automobile accident. Thereafter, CF and AF presented – incredibly – <u>on the exact same date</u>, May 24, 2017, to Oasis for initial examinations by Massoud. CF and AF were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that CF and AF suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided CF and AF with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xii)   On August 30, 2017, two insureds – JR and LS – were involved in the same automobile accident. Thereafter, JR and LS presented – incredibly – <u>on the exact same date</u>, September 14, 2017, to Oasis for initial examinations by Patel. JR and LS were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that JR and LS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Patel, Massoud, and – upon information and belief – Johnson and Wheeler provided JR and LS with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiii)  On September 12, 2017, two insureds – DN and JN – were involved in the same automobile accident. Thereafter, DN and JN presented – incredibly – <u>on the exact same date</u>, October 2, 2017, to Oasis for initial examinations by Massoud. DN and JN were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that DN and JN suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler provided DN and JN with substantially

identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiv)  On October 21, 2017, two insureds – ED and MH – were involved in the same automobile accident. Thereafter, ED and MH presented – incredibly – on the exact same date, November 2, 2017, to Oasis for initial examinations by Johnson. ED and MH were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ED and MH suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Johnson, Massoud, and – upon information and belief – Patel and Wheeler provided ED and MH with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xv)  On January 15, 2018, two insureds – BC and AC– were involved in the same automobile accident. Thereafter, BC and AC presented – incredibly – on the exact same date, May 7, 2018, to Oasis for initial examinations by Patel. BC and AC were different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BC and AC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Oasis, Patel, Massoud, and – upon information and belief – Johnson and Wheeler provided BC and AC with substantially identical, phony "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

199.  These are only representative examples. In the claims for initial examinations that are identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud frequently issued substantially identical "diagnoses", on or about the same date, to more than one Insured who had been involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

200.  Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the fraudulent charges for electrodiagnostic testing that the

Defendants purported to provide to the Insureds, but also to create a false justification for continued, medically unnecessary chiropractic services by their referral sources.

201.    In the claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely falsely represented that the initial examinations involved "moderate complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99204 and 99244 because examinations billable under CPT codes 99204 and 99244 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

202.    In the claims for initial examinations identified in Exhibit "1", Oasis, Johnson, Patel, Wheeler, Schenker, Masri, Daniel, and Massoud routinely falsely represented that the putative initial examinations involved "moderate complexity" medical decision-making in order to create a false basis for the fraudulent charges for electrodiagnostic testing that the Defendants purported to provide to the Insureds, but also to create a false basis for continued, medically unnecessary chiropractic services by their referral sources.

## 2.    Oasis Medical's Fraudulent Charges for Medically Unnecessary Pain Management Injections

203.    Pursuant to the fraudulent, boilerplate "diagnoses" that the Defendants provided during the initial examinations of Insureds involved in relatively minor motor vehicle accidents, the Defendants subjected many Insureds to a series of medically unnecessary pain management injections.

204.    As set forth in Exhibit "1", these pain management injections typically included arthrocentesis injections, which were billed through Oasis to GEICO under CPT codes 20605, 20610, and 20611.

205.    In the claims for pain management injections identified in Exhibit "1", the charges for pain management injections were fraudulent in that the injections were medically unnecessary, and were performed – to the extent that they were performed at all – pursuant to the phony "diagnoses" that the Defendants provided at the conclusion of their purported examinations.

206.    In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments.

207.    In many cases, the Defendants not only recommended that the Insureds in the claims identified in Exhibit "1" receive pain management injections based on their phony "diagnoses", but they also recommended that the Insureds receive the pain management injections before the Insureds had tried and failed a legitimate course of more conservative treatment.

208.    For example:

(i)     On September 1, 2015, an Insured named RR was involved in an automobile accident. RR allegedly received pain management injections from Oasis and Massoud less than one month later on September 16, 2015 – even though RR could not have failed conservative therapy less than one month after the purported automobile accident.

(ii)    On June 3, 2016 an Insured named MD was involved in an automobile accident. MD allegedly received pain management injections from Oasis and Massoud three days later on June 6, 2016 – even though MD could not have failed conservative therapy less than three days after the purported automobile accident.

(iii)   On October 5, 2016 an Insured named CB was involved in an automobile accident. CB allegedly received pain management injections from Oasis and Massoud less than a month later on October 31, 2016 – even though CB could not have failed conservative therapy less than three days after the purported automobile accident.

(iv)    On January 4, 2017, an Insured named VA was involved in an automobile accident. VA allegedly received pain management injections from Oasis, Johnson, and Massoud less than two months later on February 13, 2017 – even though MC could not have failed conservative therapy less than two months after the purported automobile accident.

(v)     On August 30, 2017, an Insured named LS was involved in an automobile accident. LS allegedly received pain management injections from Oasis and Patel less than

one month later on September 14, 2017 – even though LS could not have failed conservative therapy less than one month after the purported automobile accident.

(vi)    On August 30, 2017, an Insured named JR was involved in an automobile accident. JR allegedly received pain management injections from Oasis, Massoud and Patel less than one month later on September 14, 2017 – even though JR could not have failed conservative therapy less than one month after the purported automobile accident.

(vii)    On September 19, 2017, an Insured named JR was involved in an automobile accident. JR allegedly received pain management injections from Oasis and Massoud less than two months later on November 6, 2017 – even though BS could not have failed conservative therapy less than two months after the purported automobile accident.

(viii)    On January 2, 2018, an Insured named KK was involved in an automobile accident. KK allegedly received pain management injections from Oasis, Johnson, and Massoud less than two months later on February 19, 2018 – even though KK could not have failed conservative therapy less than two months after the purported automobile accident.

(ix)    On March 9, 2018, an Insured named PI was involved in an automobile accident. PI allegedly received pain management injections from Oasis, Daniel, and Massoud less than one month later on March 29, 2018 – even though PI could not have failed conservative therapy less than one month after the purported automobile accident.

(x)    On June 10, 2018, an Insured named MB was involved in an automobile accident. MB allegedly received pain management injections from Oasis and Massoud less than two months later on July 25, 2018 – even though MB could not have failed conservative therapy less than two months after the purported automobile accident.

209.    These are only representative examples. In the pain management injection claims identified in Exhibit "1", the Defendants routinely purported to perform and/or provide medically unnecessary pain management injections to Insureds before the Insureds could have tried and failed any course of legitimate, conservative treatment.

210.    The Defendants engaged in this conduct solely in order to maximize the fraudulent billing they could submit, or cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to the injections.

211.    In the claims for pain management injections identified in Exhibit "1", the Defendants purported to provide these medically unnecessary pain management injections because their focus was on generating profit, rather than on patient care.

**3.      The Fraudulent Charges for Electrodiagnostic Testing**

212.    Pursuant to medically unnecessary and unlawful referrals from the Referral Sources, the Defendants purported to subject many of the Insureds in the claims identified in Exhibit "1" to medically unnecessary electrodiagnostic ("EDX") tests, including electromyography ("EMG") and nerve conduction velocity ("NCV") tests.

213.    Masri, Schenker, and Massoud purported to perform the majority of the EDX tests that were billed to GEICO through Oasis.

214.    As set forth in Exhibit "1", Oasis, Masri, Schenker, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler then billed the EDX tests to GEICO under CPT codes 95861, 95886, 95910, 95911, and 95913, generally resulting in billing of between $2,000.00 and $4,500.00 for each Insured on whom the EDX testing purportedly was performed.

215.    In the claims for EDX tests identified in Exhibit "1", the charges for the EDX tests were fraudulent in that they misrepresented Oasis' eligibility to collect PIP Benefits in the first instance.

216.    In fact, Oasis never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "1", because neither Oasis nor the EDX tests was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey.

217.    What is more, the Defendants' charges for the EDX tests also were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment protocol instituted by the Defendants, not

to benefit the Insureds who were purportedly subjected to them.

218.   In a legitimate setting, EDX testing – as explained below – is used to evaluate the patient's condition and determine whether, and how, to change the patient's course of treatment.

219.   It is improbable – to the point of impossibility – that virtually all of the Insureds who underwent EDX testing identified in Exhibit "1" would receive a substantially similar treatment plan both before and after their EDX testing.

220.   However, and in keeping with the fact that the Defendants' charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the fraudulent treatment protocol instituted by the Defendants, the EDX tests performed on the Insureds associated with the claims identified in Exhibit "1" virtually never changed the course of the Insureds' treatment plans.

**a.     The Human Nervous System and Electrodiagnostic Testing**

221.   The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet, as well as control the functioning of various organ systems. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

222.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the brain and then extending from the spinal cord to, for example, the hands and feet through

the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.

223.   A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

224.   EMG and NCV tests both are forms of electrodiagnostic evaluations, and purportedly were provided by Oasis, Masri, Schenker, and Massoud because they were medically necessary to determine whether the Insureds had radiculopathies.

225.   The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

226.   The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**b.     The Fraudulent NCV Tests**

227.   NCV tests are non–invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

228.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well–defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

229.    There are several motor and sensory peripheral nerves in the arms and legs that can be evaluatedwith NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

230.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

231.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

232.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests Oasis, Masri, Schenker, and Massoud routinely purported to perform and/or provide: (i) NCV tests of at least 4 motor nerves; (ii) NCV tests of at least 4 sensory nerves; and (iii) at least two H-reflex studies.

233.    For example:

(i)     On May 3, 2016, Schenker, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named AR, supposedly to determine whether AR suffered from radiculopathy.

(ii)     On June 6, 2016, Schenker, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named WD, supposedly to determine whether WD suffered from radiculopathy.

(iii)    On April 25, 2017, Schenker, Massoud, and Oasis purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named AS, supposedly to determine whether AS suffered from radiculopathy and/or neuropathy.

(iv)    On May 30, 2017, Schenker, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named EG, supposedly to determine whether EG suffered from radiculopathy.

(v)     On May 30, 2017, Schenker, Massoud, and Oasis purported to provide 8 motor nerve NCV tests, 8 sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named AR, supposedly to determine whether AR suffered from radiculopathy.

(vi)    On June 6, 2017, Schenker, Massoud, and Oasis purported to provide 8 motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named GF, supposedly to determine whether GF suffered from radiculopathy.

(vii)   On November 7, 2017, Schenker, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named MG, supposedly to determine whether MG suffered from radiculopathy.

(viii)  On November 28, 2017, Schenker, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named RU, supposedly to determine whether RU suffered from radiculopathy.

(ix)    On December 27, 2017, Masri, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, two H-reflex studies and multiple F-wave studies to an Insured named KM, supposedly to determine whether KM suffered from radiculopathy.

(x)     On January 17, 2018, Masri, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named JR, supposedly to determine whether JR suffered from radiculopathy.

(xi)    On February 8, 2018, Masri, Massoud, and Oasis purported to provide 4 motor

nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named MQ, supposedly to determine whether MQ suffered from radiculopathy.

(xii)   On March 22, 2018, Masri, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named MS, supposedly to determine whether MS suffered from radiculopathy.

(xiii)  On May 8, 2018, Masri, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, and two H-wave studies to an Insured named GJ, supposedly to determine whether GJ suffered from radiculopathy.

(xiv)   On May 31, 2018, Masri, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 4 sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies to an Insured named AC, supposedly to determine whether AC suffered from radiculopathy.

(xv)    On July 17, 2018, Masri, Massoud, and Oasis purported to provide 4 motor nerve NCV tests, 6 sensory nerve NCV tests, and multiple F-wave studies to an Insured named NE, supposedly to determine whether NE suffered from radiculopathy.

234.   These are only representative examples. In the claims for NCV tests identified in Exhibit "1", Oasis, Masri, Schenker, and Massoud routinely purported to perform and/or provide a grossly–excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

235.   Oasis, Masri, Schenker, and Massoud routinely purported to provide and/or perform NCVs on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCVs were medically necessary to determine whether the Insureds had radiculopathies.

236.   What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

237.   In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real–time results obtained as the NCV

tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

238.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient–to–patient.

239.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCVs] are individually designed by the electrodiagnostic consultant for each patient. The examination design is dynamic and often changes during the course of the study in response to new information obtained.

240.    This concept also is emphasized in the CPT Assistant, which states that "Pre–set protocols automatically testing a large number of nerves are not appropriate."

241.    Even so, Oasis, Masri, Schenker, and Massoud did not tailor the NCV tests they purported to perform and/or provide to the unique circumstances of each individual Insured.

242.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibit "1".

243.    In particular, Oasis, Masri, Schenker, and Massoud purported to test some combination of the following peripheral nerves and nerve fibers – and in many cases, all of them – in virtually all of the NCV test claims identified in Exhibit "1":

(i)     left and right median motor nerves;

(ii)    left and right peroneal motor nerves;

(iii)   left and right tibial motor nerves;

(iv)    left and right ulnar motor nerves;

(v)     left and right median sensory nerves;

(vi)    left and right radial sensory nerves;

(vii)   left and right superficial peroneal sensory nerves;

(viii)    left and right sural sensory nerves; and

(ix)    left and right ulnar sensory nerves.

244.    Oasis, Masri, Schenker, and Massoud purported to test these identical nerves and nerve fibers in many of the NCV claims identified in Exhibit "1", despite the fact that the Insureds were differently situated, because their objective was to charge for as many NCV tests as possible, and not to treat or otherwise benefit the Insureds.

245.    The cookie–cutter approach to the NCVs that Oasis, Masri, Schenker, and Massoud purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie–cutter approach to the NCVs was designed solely to maximize the charges that the Defendants could submit to GEICO and other insurers, and to maximize ill–gotten profits for the Defendants.

c.    **The Fraudulent EMG Tests**

246.    EMGs involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well–defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

247.    There are many different muscles in the arms and legs that can be tested using EMGs. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real–time results obtained from the EMGs as they are performed on each specific muscle. As a result, the number of limbs as well as the nature and number of the muscles tested through EMGs should vary from patient–to–patient.

248.    According to the Recommended Policy, the maximum number of EMG tests necessary to diagnose a radiculopathy in 90 percent of all patients is EMG tests of two limbs.

249.    Even if there were any need for any of the EMG tests that Oasis, Massoud, Masri and Schenker purported to provide, the nature and number of the EMGs that Oasis, Massoud, Masri and Schenker purported to provide often exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

250.    In many of the claims for EMG tests identified in Exhibit "1", Oasis, Masri, Schenker, and Massoud purported to provide and/or perform EMGs on either three or four limbs on a single date of service, or a total of four limbs over two separate dates of service, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit to GEICO.

251.    For example:

(i)     On April 25, 2017, Schenker, Massoud, and Oasis purported to provide a four–limb EMG to an Insured named AS, supposedly to determine whether AS suffered from radiculopathy.

(ii)    On May 30, 2017, Schenker, Massoud, and Oasis purported to provide a four–limb EMG to an Insured named AR, supposedly to determine whether AR suffered from radiculopathy.

(iii)   On June 6, 2017, Schenker, Massoud, and Oasis purported to provide a four–limb EMG to an Insured named GF, supposedly to determine whether GF suffered from radiculopathy.

(iv)    On June 20, 2017, Schenker, Massoud, and Oasis purported to provide a four–limb EMG to an Insured named EG, supposedly to determine whether EG suffered from radiculopathy.

(v)     On February 14, 2018, Masri, Massoud, and Oasis purported to provide a two–limb EMG to an Insured named PV, and on April 11, 2018 Masri, Massoud, and Oasis purported to provide another two–limb EMG to PV, supposedly to determine whether PV suffered from radiculopathy.

252.    In many of the EMG claims identified in Exhibit "1", Oasis, Masri, Schenker, and Massoud purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured.

**d.    The Fraudulent Radiculopathy "Diagnoses"**

253.    Radiculopathies with positive neurodiagnostic testing are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large–scale, peer–reviewed 2009 study conducted by Randall L. Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

254.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary EDX testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the Oasis, Massoud, Masri, and Schenker purported to treat.

255.    As a result, the frequency of clinically significant radiculopathy in all motor vehicle accident victims – not only those who have relatively serious injuries that require referral to a major hospital EDX laboratory – is significantly lower than 19 percent.

256.    As set forth above, virtually none of the Insureds whom Oasis, Massoud, Masri, and Schenker purportedly treated suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

257.    Even so, in the EMG and NCV claims identified in Exhibit "1", Oasis, Masri, Schenker, and Massoud purported to identify radiculopathies in most of the Insureds to whom they purported to provide EMG and NCV testing.

258.    Oasis, Masri, Schenker, and Massoud purported to arrive at their pre–determined

radiculopathy diagnosis in order to create the false appearance of severe injuries and thereby provide a false justification for the medically unnecessary Fraudulent Services that the Defendants purported to provide, but also to create a false basis for continued, medically unnecessary chiropractic services by their referral sources.

**e.    Misrepresentations Regarding the Reimbursable Amount for the EDX Testing**

259.    As set forth above, the no-fault laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A–4.6; N.J.A.C. 11:3–29.6.

260.    Not only did Oasis, Masri, Schenker, and Massoud routinely falsely represent that their excessive EDX testing was medically necessary, and routinely falsely represent the results of the EDX tests, but Oasis, Masri, Schenker, and Massoud, and – upon information and belief – Johnson, Patel, and Wheeler, also routinely misrepresented the reimbursable amount for the EDX tests.

261.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare providers in the northern New Jersey area to submit maximum charges of: (i) $1,410.80 for an 8 motor nerve NCV (including any F-wave studies); (ii) $1,356.40 for a 10 sensory nerve NCV; (iii) $311.86 for two H-reflex studies; and (iv) $434.98 for a four–limb EMG.

262.    Thus, a healthcare provider that provided an eight motor nerve NCV (including any F-wave studies), a 10 sensory nerve NCV, two H-reflex studies, and a four–limb EMG would be entitled to recover a maximum of $3,514.04 for the combined testing – assuming that the testing was medically necessary in the first instance.

263.    However, to maximize their fraudulent billing for their medically unnecessary EDX

testing, Oasis, Masri, Schenker, and Massoud, and – upon information and belief – Johnson, Patel, and Wheeler routinely falsely represented that they were entitled to recover at least $5,000.00 for an eight motor nerve NCV (including any F-wave studies), a 10 sensory nerve NCV, two H-reflex studies, and a four–limb EMG.

264.    For example:

(i)     Schenker, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler represented that they were entitled to recover $5,225.00 for an eight motor nerve NCV with F-wave studies, a ten sensory nerve NCV, two H-reflex studies, and a four–limb EMG that they purported to provide to an Insured named AS on April 25, 2017.

(ii)    Schenker, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler represented that they were entitled to recover $5,225.00 for an eight motor nerve NCV with F-wave studies, an eight sensory nerve NCV, two H-reflex studies, and a four–limb EMG that they purported to provide to an Insured named AR on May 30, 2017.

(iii)   Schenker, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler represented that they were entitled to recover $5,225.00 for an eight motor nerve NCV with F-wave studies, a ten sensory nerve NCV, two H-reflex studies, and a four–limb EMG that they purported to provide to an Insured named GFon June 6, 2017.

(iv)    Schenker, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler represented that they were entitled to recover $4,885.00 for a four motor nerve NCV with F-wave studies, a six sensory nerve NCV, and a two–limb EMG that they purported to provide to an Insured named WD on June 6, 2017.

(v)     Masri, Massoud, Oasis, and – upon information and belief – Johnson, Patel, and Wheeler represented that they were entitled to recover $2,400.00 for a four motor nerve NCV with F-wave studies, a six sensory nerve NCV, and a two–limb EMG that they purported to provide to an Insured named PV on February 14, 2018 and then again represented that they were entitled to recover $2,400.00 for a four motor nerve NCV, a four sensory nerve NCV, two H-reflex studies, and a two–limb EMG that they purported to provide to PV on April 11, 2018.

265.    These are only representative examples. As set forth in Exhibit "1", Oasis, Massoud, Masri, Schenker, and – upon information and belief – Johnson, Patel, and Wheeler routinely falsely represented that they were entitled to be reimbursed for their putative EDX tests

in amounts far in excess of the amounts set forth in the Fee Schedule.

266.     Each and every time that Oasis, Massoud, Masri, Schenker, Johnson, Patel, and Wheeler falsely represented that they were entitled to be reimbursed for their putative EDX tests in amounts far in excess of the amounts set forth in the Fee Schedule constituted a separate violation of N.J.S.A. § 39:6A–4.6 and N.J.A.C. 11:3–29.6.

267.     In the claims identified in Exhibit "1", Oasis, Massoud, Masri, Schenker, and – upon information and belief – Johnson, Patel, and Wheeler routinely falsely represented that they were entitled to be reimbursed for their putative EDX tests in amounts far in excess of the amounts set forth in the Fee Schedule in order to maximize the fraudulent billing that they could submit to GEICO.

## 4.     The Fraudulent Billing Through Oasis for Services That Were Unlawfully Provided in New York

268.     Not only did the Defendants bill for medically unnecessary, illusory, and otherwise non–compensable services, but Defendants falsely represented that Oasis was eligible to collect PIP Benefit in connection with services that purportedly were provided in New York.

269.     As set forth above, Oasis is a New Jersey medical professional entity, not a New York medical professional entity.

270.     As set forth above, healthcare providers that fail to comply with pertinent statutory and regulatory requirements are not eligible to collect PIP Benefits, whether or not the underlying services were medically necessary and actually performed.

271.     Pursuant to New York law, foreign medical professional entities operating in New York must apply for authority to do business in New York and must have a certificate of authority from the New York Department of Education. See, e.g., N.Y. Educ. Law §§ 6509(8), 6530(12); N.Y. Bus. Corp. Law §§ 1503, 1514, 1530.

272.    Upon information and belief, Oasis never obtained a certificate of authority from the New York Department of Education, and never was authorized to do business in New York.

273.    For instance, the New York Department of State Division of Corporations website indicates that Oasis never was organized in New York or authorized to do business in New York.

274.    Likewise, the New York Education Department's Office of the Professions website indicates that Oasis never received any certificate of authority from the New York Education Department.

275.    Even so, in the claims identified in Exhibit "1", Defendants billed GEICO through Oasis for examinations that purportedly were conducted in New York.

276.    For example:

(i)     Oasis and Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Massoud purportedly provided on June 1, 2015, to an Insured named YC at 255 Eastern Parkway, Suite 100, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(ii)    Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on December 28, 2015, to an Insured named JA at 1090 Coney Island Ave, 4th Floor, Suite B, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(iii)   Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on January 26, 2016, to an Insured named CV at 1090 Coney Island Ave, 4th Floor, Suite B, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(iv)    Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on February 25, 2016, to an Insured named PA at 295 Hempstead Turnpike, Elmont, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(v)     Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on

March 6, 2016, to an Insured named OA at 1090 Coney Island Ave, 4th Floor, Suite B, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(vi)     Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Massoud purportedly provided on April 6, 2016, to an Insured named LM at 255 Eastern Parkway, Suite 100, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(vii)    Oasis, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Massoud purportedly provided on January 12, 2017, to an Insured named BH at 255 Eastern Parkway, Suite 100, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(viii)   Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on February 13, 2017, to an Insured named EC at 293 East 53rd Street, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(ix)    Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on March 10, 2017, to an Insured named SE at 293 East 53rd Street, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(x)     Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on March 27, 2017, to an Insured named JH at 293 East 53rd Street, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(xi)    Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on June 12, 2017, to an Insured named JM at 951 Brook Avenue, Suite 203, Bronx, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(xii)    Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on June 27, 2017, to an Insured named SH at 293 East 53rd Street, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(xiii)  Oasis, Johnson, Massoud, and – upon information and belief – Patel and Wheeler billed GEICO for an examination that Johnson purportedly provided on May 23, 2018, to an Insured named LL at 1530 Bedford Avenue, 3 Floor, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(xiv)  Oasis, Daniel, Massoud, and – upon information and belief – Johnson, Patel, and Wheeler billed GEICO for an examination that Daniel purportedly provided on July 9, 2018, to an Insured named BB at 1530 Bedford Avenue, 3 Floor, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

(xv)  Oasis, Johnson, Massoud, and – upon information and belief – Patel and Wheeler billed GEICO for an examination that Johnson purportedly provided on September 29, 2018, to an Insured named RH at 1530 Bedford Avenue, 3 Floor, Brooklyn, New York, despite the fact that Oasis was not eligible to collect PIP Benefits in connection with the putative examination.

277.  These are only representative examples. In the claims identified in Exhibit "1", Defendants routinely billed GEICO through Oasis for examinations that were unlawfully performed in New York, to the extent that they were performed at all.

278.  Each such bill falsely represented that Oasis was eligible to receive PIP Benefits in connection with the purported services, when in fact it was not.

### III.  The Fraudulent Billing Submitted to GEICO

279.  To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of HCFA–1500 forms and treatment reports through Oasis, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

280.  The HCFA–1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevent Act, in the following material respects:

(i)  The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In

fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) the Defendants purported to provide, and billed for, the medically unnecessary and illusory Fraudulent Services; (c) they routinely violated N.J.S.A. § 39:6A–4.6(c) and N.J.A.C. 11:3–29.6; and (d) the Defendants unlawfully operated Oasis in New York without a certificate of authority from the New York Department of Education and without Oasis being authorized to do business in New York.

(ii)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible for PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible for PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; (b) the Fraudulent Services were medically unnecessary and in some cases illusory; and (c) the Fraudulent Services were unlawfully performed through Oasis in New York, despite the fact that Oasis lacked the requisite authority to operate in New York.

(iii)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed in the first instance. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.    **GEICO's Justifiable Reliance**

281.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

282.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to

accomplish this concealment.

283.    For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre–determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

284.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

285.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to illegal self-referral arrangements between and among the Defendants as well as pursuant to an illegal kickback scheme.

286.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time–consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full.

287.    GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially–valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,400,000.00.

288.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not

reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Oasis
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

289.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

290.    There is an actual case in controversy between GEICO and Oasis regarding whether Oasis was in compliance with all significant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO.

291.    As set forth above, at all relevant times, Oasis operated in violation of law by engaging in pervasive violations of the Codey Law, by billing unlawfully inflated amounts for medically unnecessary services, and in some cases illusory services, by engaging in an illegal referral and kickback scheme, and by operating in New York without the requisite authority to do so.

292.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that from 2015 through the present, Oasis was not in compliance with all relevant laws and regulations governing healthcare practice.

## SECOND CAUSE OF ACTION
### Against All Defendants
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A–1 et seq.))

293.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

294.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", the Defendants

knowingly submitted or caused to be submitted HCFA–1500 forms and treatment reports to

GEICO that were false and misleading in the following material respects:

(i)     The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement because: (a) the Defendants paid and received unlawful compensation in exchange for patient referrals; (b) the Defendants purported to provide, and billed for, the medically unnecessary and illusory Fraudulent Services; (c) they routinely violated N.J.S.A. § 39:6A–4.6(c) and N.J.A.C. 11:3–29.6; and (d) the Defendants unlawfully operated Oasis in New York without a certificate of authority from the New York Department of Education and without being authorized to do business in New York.

(ii)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided pursuant to an unlawful kickback scheme; (b) the Fraudulent Services were medically unnecessary and in some cases illusory; and (c) the Fraudulent Services were, in many cases, unlawfully performed through Oasis in New York, despite the fact that Oasis lacked the requisite authority to operate in New York.

(iii)   The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre–determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)    The HCFA–1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

295.    The Defendants' systemic violation of the New Jersey Insurance Fraud Prevention

Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33–A–7.

296.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $3,400,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**THIRD CAUSE OF ACTION**
**Against Johnson, Patel, and Wheeler**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

297.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

298.    Oasis is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

299.    Johnson, Patel, and Wheeler have knowingly conducted and/or participated, directly or indirectly, in the conduct of Oasis' affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Oasis was not entitled to receive under the no-fault laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Oasis nor the underlying services were in compliance with

applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

300.    Oasis' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Johnson, Patel, and Wheeler have operated Oasis, inasmuch as Oasis is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Oasis to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Oasis to the present day.

301.    Oasis is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Oasis in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

302.    GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $3,400,000.00 pursuant to the fraudulent bills submitted through Oasis.

303.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Daniel, Johnson, Patel, Schenker, Masri, and Wheeler**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

304.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

305.    Oasis is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

306.    Daniel, Johnson, Patel, Schenker, Masri, and Wheeler are employed by and/or associated with Oasis.

307.    Daniel, Johnson, Patel, Schenker, Masri, and Wheeler knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Oasis' affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Oasis was not entitled to receive under the no-fault laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre–determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Oasis nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

308.   Oasis' business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Massoud has operated Oasis, inasmuch as Oasis is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Oasis to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Oasis to the present day.

309.   Oasis is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Oasis in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

310.   Daniel, Johnson, Patel, Schenker, Masri, and Wheeler knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

311.   GEICO has been injured in its business and property by reason of the above–described conduct in that it has paid at least $3,400,000.00 pursuant to the fraudulent bills submitted through Oasis.

312.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against All Defendants
### (Common Law Fraud)

313.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

314.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

315.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that the Defendants were in compliance with all relevant laws and regulations governing healthcare practice, when in fact they were not; (ii) in every claim identified in Exhibit "1", the representation that the Defendants were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that the billed-for services were medically necessary, when in fact they were not, and were provided – to the extent that they were provided at all – pursuant to an illegal referral scheme designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them; and (iv) in every claim in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

316.    The Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Oasis that were not compensable under New Jersey's no-fault laws.

317.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $3,400,000.00 pursuant to the fraudulent bills submitted by the Defendants through Oasis.

318.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

319.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

320.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 288 above.

321.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

322.    When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

323.    The Defendants have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

324.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

325.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $3,400,000.00.

## JURY DEMAND

326.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Oasis, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, between 2015 and the present, Oasis was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey;

B.    On the Second Cause of Action against the Defendants, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $3,400,000.00, as well as: (i) treble damages; (ii) the costs and counsel feels incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A–7;

C.    On the Third Cause of Action against Johnson, Patel, and Wheeler, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $3,400,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Daniel, Johnson, Patel, Schenker, Masri, and Wheeler, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $3,400,000.00, together with treble damages, costs, and reasonable attorneys' fees

pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against the Defendants, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $3,400,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against the Defendants, more than $3,400,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: May 13, 2020

RIVKIN RADLER LLP

By:     *s/ Gene Y. Kang*_____
        Gene Y. Kang, Esq.
        Michael Vanunu, Esq.
        Barry I. Levy, Esq. (to be admitted *pro hac vice*)
        Max Gershenoff, Esq. (to be  admitted *pro hac vice*)
        25 Main Street, Suite 501
        Court Plaza North
        Hackensack, New Jersey 07601
        (201) 287–2460

4645642.v8